549 Pa. 12 (1997)
700 A.2d 400
COMMONWEALTH of Pennsylvania Appellee
v.
Anthony WASHINGTON, Appellant.
Supreme Court of Pennsylvania.
Argued December 12, 1996.
Decided August 20, 1997.
Reargument Denied September 26, 1997.
*13 *14 *15 *16 *17 *18 *19 *20 George Henry Newman, Philadelphia, for A. Washington.
Catherine Marshall, Philadelphia, for the Com.
Robert A. Graci, Harrisburg, and Anthony V. Pomeranz, Philadelphia, for the Com. Office of Atty. Gen.
Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

OPINION
NIGRO, Justice.
On October 11, 1994, following a jury trial, Appellant Anthony Washington was found guilty of first-degree murder for the killing of Tracey Lawson. The jury returned a verdict of death, and on December 9, 1994 the trial court formally imposed the death sentence. This direct appeal followed. For the reasons presented herein, we affirm the judgment of sentence.
Although Appellant does not challenge the sufficiency of the evidence, this Court is required in capital cases to review the record to determine whether the Commonwealth has established the elements necessary to sustain a conviction for first-degree murder. See Commonwealth v. Zettlemoyer, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), reh'g denied, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In conducting such a review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner and determine whether the jury could find every element of the crime *21 beyond a reasonable doubt. See Commonwealth v. Michael, 544 Pa. 105, 110-12, 674 A.2d 1044, 1047 (1996).
To obtain a conviction for first-degree murder, the Commonwealth must prove that a human being was unlawfully killed; that the defendant did the killing; and that the killing was done intentionally. See 18 Pa.C.S. § 2502(a), (d) (1983); Commonwealth v. Wilson, 543 Pa. 429, 438, 672 A.2d 293, 297 (1996). Further, the specific intent to kill may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. See Michael, 544 Pa. at 110-12, 674 A.2d at 1047; Commonwealth v. Bond, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995).
The relevant facts are as follows. On the evening of January 23, 1993, Appellant and his co-defendant, Derrick Teagle, drove to a Sav-A-Lot supermarket in Philadelphia with the intention of robbing it. Both men were armed with handguns, but Teagle's was not functioning due to a broken firing mechanism.
Pretending to be customers, Appellant and Teagle entered the store. Teagle bought a bag of potato chips. Stating that they were in search of employment, Appellant and Teagle then asked to see the store manager, Anne Marie Buchanan. When Buchanan told them she had no job application forms, the men left the store.
A few minutes later, they returned. Teagle pointed his gun at Buchanan, and Appellant ordered her to open the store's safe. Teagle then went to empty the cash registers. At this point, Juana Robles, a customer, attempted to leave the store. Appellant pointed his gun at her and ordered her not to leave.
Tracey Lawson, the store's unarmed security guard, was in the parking lot. When he saw the robbery taking place, he pulled down the metal grating that secures the entrance to the store during non-business hours. Appellant and Teagle, however, noticed this happening. They ran to the entrance, lifted the grating and entered the parking lot.
*22 Lawson went into a nearby store and alerted the store's manager and the security guard, Gerard Smith, who was an off-duty police officer. All three men then ran into the parking lot, where Smith ordered Appellant and Teagle to halt. As he and Teagle fled, Appellant fired his weapon at Smith, who fired back. Lawson then began to chase after Appellant. When he saw Lawson pursuing him, Appellant turned and fired, hitting Lawson in the head. Appellant and Teagle then left the scene. Lawson died in the hospital three days later.
Teagle eventually surrendered to police and gave a statement regarding the incident. Appellant, however, remained a fugitive until police received an anonymous tip disclosing his whereabouts. On April 19, 1993, the arresting officers proceeded to the address provided by the tip. When Appellant answered the door, the officers stated that they had an arrest warrant for him for murder. Appellant claimed that he was not Anthony Washington. The officers responded by showing Appellant an eight-by-ten inch photograph of himself. At that point, Appellant admitted that he was indeed Anthony Washington and submitted to the arrest. See N.T., 10/6/94, at 52-55.
At trial, Appellant's brother, Elijah Washington, testified that on the night of the robbery, he was called to the home of Mimi Miller, where Appellant and Teagle were located. Appellant told Elijah to drive Teagle home because the police might be looking for Appellant and Teagle. See N.T., 10/5/94, at 42-43.
Sometime after the shooting, Appellant telephoned his friend Levon Robinson. Robinson was dating Martha Harrington. Appellant was dating Martha's sister, Melissa Harrington. As Appellant spoke to Robinson, Martha listened in on their conversation through an extension telephone. She testified at trial that Appellant told Robinson that he had shot someone at Sav-A-Lot and that he was going to go to Maryland. See N.T., 10/4/94, at 10-11. After Appellant's conversation with Robinson, Martha saw Appellant at the home of another of her sisters, Sharon Harrington. At Sharon's *23 house, Appellant told Martha that he shot a security guard during the robbery. See id. at 12-13.
Melissa Harrington testified that Appellant told her over the phone and in person that he had robbed the Sav-A-Lot and shot a security guard. See id. at 35-37. She further testified that she visited Appellant in prison and he told her to lie on the stand and tried to "school [her] on things to say." Id. at 56-57.
Juana Robles was a customer in the Sav-A-Lot at the time of the robbery. She testified at trial and identified Appellant as the man who had pointed a gun at her near the entrance to the Sav-A-Lot and ordered her not to leave the store. See N.T., 9/29/94, at 107-11. She could not positively identify Appellant in a line-up on August 18, 1993, but was able to do so at trial. See id. at 112-14.
Suphea Phongsak was working as a cashier in the Sav-A-Lot when the robbery occurred. She identified Teagle at a line-up and at trial as the man who had emptied her cash register at gunpoint. See N.T., 9/30/94, at 78-79. She testified that she saw another man at the safe with the manager Anne Marie Buchanan. She had given a description of this man to police, stating among other things that he was wearing a three-quarter length green leather jacket. Martha Harrington's testimony established that Appellant owns a jacket matching Phongsak's description. See N.T., 10/4/94, at 19. At a line-up on August 18, 1993, however, Phongsak could not identify Appellant as the man she saw near the safe. See N.T., 9/30/94, at 103-04.
Gerard Smith, the off-duty police officer, identified Appellant from a photo array six weeks after the shooting. He also identified Appellant at a line-up, at the preliminary hearing, and at trial. See N.T., 10/3/94, at 69, 89-95.
Finally, ballistics evidence established that the bullet that killed Tracey Lawson was not fired from Officer Smith's weapon. See N.T., 10/5/94, at 131-32.
This evidence is sufficient to establish that Appellant shot Lawson and did so with the specific intent to kill. Thus, viewing the evidence in the light most favorable to the Commonwealth *24 as verdict winner, the jury could have found each element of an intentional killing beyond a reasonable doubt. See 18 Pa.C.S. § 2502(a), (d) (1983); Wilson, 543 Pa. at 438, 672 A.2d at 297.
Appellant and Teagle were tried jointly.[1] On October 11, 1994, the jury found Appellant guilty of first-degree murder,[2] robbery,[3] simple assault,[4] possessing an instrument of crime,[5] and criminal conspiracy.[6] After a penalty hearing, the jury found that one aggravating circumstance[7] outweighed one mitigating circumstance.[8] The jury therefore returned a verdict of death, which the trial court formally imposed on December 9, 1994.[9] Appellant then directly appealed to this Court.[10]
Appellant first argues that the trial court abused its discretion by denying his motion to sever his trial from Teagle's.[11] Appellant claims that he was prejudiced by the *25 admission of Teagle's redacted confession because it "contextually implicated" him in the killing and therefore violated Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
In Bruton, the U.S. Supreme Court held that the introduction at trial of a non-testifying co-defendant's confession describing the defendant's participation in a crime deprives the defendant of his rights under the Confrontation Clause of the Sixth Amendment. It is well-settled, however, that no Bruton violation occurs if the co-defendant's statement is redacted to remove any specific references to the defendant and if a proper limiting instruction is given. See Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); Commonwealth v. Jones, 542 Pa. 464, 495-96, 668 A.2d 491, 506 (1996). In the instant case, the word "Blank" was substituted for any reference to Appellant in Teagle's statement. Further, prior to the introduction of the statement, the trial court instructed the jury that it was to consider the statement as evidence only against Teagle. See N.T., 10/6/94, at 64-65. The court then repeated this instruction in its jury charge. See N.T., 10/11/94, at 16. Thus, the introduction of Teagle's statement did not violate Bruton.
Despite this, Appellant suggests that he suffered prejudice nonetheless because the jury, viewing the redacted confession in light of the other evidence connecting Appellant to the murder, could have inferred that the unnamed individual mentioned in the confession was actually Appellant. In other words, Appellant contends that he was prejudiced as the result of a Bruton violation occurring through contextual implication.
We realize that contextual implication can impact a defendant's rights under the Confrontation Clause. However, *26 reversible error does not necessarily result from every infringement of a defendant's right to confront witnesses against him. Review under the harmless error standard set forth in Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155 (1978) is appropriate in such circumstances. See Bond, 539 Pa. at 312, 652 A.2d at 314. Under Story, an error is harmless if it could not have contributed to the verdict because the erroneously admitted evidence is merely cumulative of substantially similar, properly admitted evidence. See Story, 476 Pa. at 411, 383 A.2d at 165. In the instant case, even assuming that the admission of Teagle's redacted statement infringed upon Appellant's rights under the Confrontation Clause, the error was indeed harmless and did not prejudice Appellant. Any evidence of Appellant's involvement in the shooting that could be inferred from Teagle's confession was merely cumulative of other, properly admitted evidence indicating his guilt. Officer Smith was an eyewitness to the shooting of Tracey Lawson. He identified Appellant as the shooter in a photo array, at a line-up, at the preliminary hearing, and at trial. Juana Robles also identified Appellant at trial as the shooter. Both Martha and Melissa Harrington testified that Appellant admitted to them that he had committed the killing in the course of robbing the Sav-A-Lot. Further, Elijah Washington testified that on the night of the shooting, Appellant asked him to drive Teagle home because the police might be looking for Appellant and Teagle. Also, when arrested, Appellant tried to deceive the arresting officers and submitted to the arrest only after a photograph clearly indicated that the officers were not mistaken in their identification. Finally, the ballistics evidence indicated that the bullet that killed Lawson did not come from Officer Smith's handgun.
Thus, even assuming that a Bruton violation occurred, it was harmless error in light of the properly admitted evidence clearly establishing Appellant's guilt. See Commonwealth v. Chestnut, 511 Pa. 169, 174-75, 512 A.2d 603, 605-06 (1986); Story, 476 Pa. at 411, 383 A.2d at 165.
In light of this, and considering the trial court's instructions to the jury, Appellant has failed to demonstrate that he was *27 prejudiced by the denial of his motion to sever. Accordingly, we find no abuse of discretion on the part of the trial court. See Commonwealth v. Wharton, 530 Pa. 127, 142, 607 A.2d 710, 717-18 (1992).
In a related claim, Appellant argues that the prosecution engaged in misconduct during closing argument by using Teagle's statement to establish Appellant's guilt. Appellant is essentially arguing that he was unduly prejudiced by the prosecution's "breaking" of redaction during closing argument.
This claim is without merit. The prosecutor is allowed to vigorously argue his case so long as his comments are supported by the evidence or constitute legitimate inferences arising from that evidence. See Commonwealth v. LaCava, 542 Pa. 160, 181, 666 A.2d 221, 231 (1995); Commonwealth v. Smith, 490 Pa. 380, 388, 416 A.2d 986, 989 (1980). In considering a claim of prosecutorial misconduct, our inquiry "is centered on whether the defendant was deprived of a fair trial, not deprived of a perfect one." LaCava, 542 Pa. at 181, 666 A.2d at 231 (citing Commonwealth v. Holloway, 524 Pa. 342, 353, 572 A.2d 687, 693 (1990)). Thus, a prosecutor's remarks do not constitute reversible error unless their "`unavoidable effect . . . [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.'" Bond, 539 Pa. at 314, 652 A.2d at 315 (quoting Commonwealth v. D'Amato, 514 Pa. 471, 490, 526 A.2d 300, 309 (1987)). Further, the allegedly improper remarks must be viewed in the context of the closing argument as a whole. See LaCava, 542 Pa. at 189, 666 A.2d at 235; Smith, 490 Pa. at 388, 416 A.2d at 989.
The prosecutor began his closing argument with a discussion of the evidence against Appellant. After concluding his argument concerning Appellant, the prosecutor clearly stated to the jury that he was switching his focus to Teagle. He then proceeded to outline the evidence against Teagle, including Teagle's statement. As noted above, this statement had been redacted and was thus admissible. See Richardson v. Marsh, *28 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987); Jones, 542 Pa. at 495-96, 668 A.2d at 506; Chestnut, 511 Pa. at 174-75, 512 A.2d at 605-06; Story, 476 Pa. at 411, 383 A.2d at 165.
However, during his discussion of Teagle's guilt, the prosecutor broke redaction and referred to Teagle's accomplice as Anthony Washington. Appellant suggests that this denied him a fair trial. We disagree.
The prosecutor stated:
Teagle's suggested it's fair not to find him guilty of any murder, and I ask you is that fair? . . . Because one of them has the gun that works, and I'm not even suggesting that Derrick's gun doesn't work . . ., but I'm suggesting that Anthony Washington is the shooter. Is it fair then that Derrick Teagle is not responsible, some way, shape or form for what went on that night?
* * *
What does Derrick Teagle know that night? Even according to his own statement. He knows the gun works, he knows it's loaded. He knows it's ready to go. . . . He goes in to commit the armed robbery with this man here, then he's shocked that somebody got hurt. . . .
In his statement Derrick Teagle says when asked the question, about taking the gun, he said he took the gun because he didn't want someone to get hurt. . . . But read the statement, Ladies and Gentlemen. On that night his accomplice didn't give him the broken gun. . . . He said I'm taking the gun, one that works, you take the one that's broken. He gives him a choice of guns and that says something right there, doesn't it? Here is the choice, Derrick. One works, one doesn't. What does Derrick say? I'm taking the one that doesn't work. You take the one 
N.T., 10/7/94, at 94-96. At that point, defense counsel requested a sidebar during which he objected and requested a *29 mistrial. The trial court denied the mistrial motion, but issued a forceful cautionary instruction to the jury.[12]
The prosecutor then continued his closing argument, stating:
Teagle made the statement in his closing that whoever it was who shot Tracey Lawson in the parking lot did it on his own. Ladies and Gentlemen, stop here for a minute. If Derrick Teagle does not agree to go along with Anthony Washington and do this robbery, does Anthony Washington do it himself or does he need someone to go with him? Use your common sense on that one. This doesn't happen, none of it happens, we're not here [if] Derrick Teagle doesn't say, Anthony, I'm in. Count me in. None of it happens. None whatsoever.
Teagle is given a choice of guns, as I said, and that says something right there. The accomplice doesn't say I'm taking the one that works, you take the one that doesn't work, he says here's your choice, which is it going to be. One of them works. It's loaded, it's ready to go.
Id. at 99. Defense counsel again requested a sidebar and again moved for mistrial. As before, the motion was denied, but a cautionary instruction was given.[13]
*30 Viewing the prosecution's roughly 45-page closing argument as a whole and examining the instances of broken redaction in context, and in consideration of the properly admitted, independent evidence establishing Appellant's guilt, the prosecution's breaking of redaction was not so prejudicial that its unavoidable effect was to negate the jury's ability to render a true verdict. See LaCava; Bond. Moreover, after defense counsel objected to the prosecutor's comments, the trial court issued cautionary instructions clearly indicating that the jury was not permitted to use Teagle's statement as evidence against Appellant. As noted above, similar instructions were given prior to the initial introduction of Teagle's statement and in the court's jury charge. The jury was also instructed that neither counsel's closing arguments constituted evidence in the case. See N.T., 10/7/94, at 3. Given this, we cannot conclude that the prosecution's breaking of redaction denied Appellant a fair trial.[14]See LaCava; Commonwealth *31 v. Rainey, 540 Pa. 220, 231 n. 5, 656 A.2d 1326, 1332 n. 5, cert. denied, ___ U.S. ___, 116 S.Ct. 562, 133 L.Ed.2d 488 (1995); Bond. Accordingly, no relief is due.[15]
Next, Appellant raises three ineffective assistance of counsel claims. To prevail on each of these claims, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness. See Commonwealth v. Howard, 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994).
First, Appellant argues that counsel was ineffective for failing to "life-qualify" four of the jurors, i.e., to ask them during voir dire if they would automatically impose the death penalty if Appellant was convicted of first-degree murder. Appellant is entitled to no relief. In Commonwealth v. Jermyn, 516 Pa. 460, 533 A.2d 74 (1987), this Court stated:
[I]n order to prevail on the instant issue it would be incumbent upon appellant to demonstrate that trial counsel's *32 failure to specifically ask prospective jurors if they would automatically vote to impose the death penalty resulted in the impanelling of a jury on which one or more jurors were so predisposed.
* * *
The mere fact that counsel may not have posed the specific question as to whether a prospective juror would vote for a sentence of life imprisonment in an appropriate case does not justify the conclusion that counsel failed to assure that a fair and impartial jury was selected. Such a talismanic requirement would clearly place form above substance.
Jermyn, 516 Pa. at 487-88, 533 A.2d at 87. Based upon this reasoning, we have repeatedly rejected the argument Appellant advances. See, e.g., Commonwealth v. Morris, 546 Pa. 296, 684 A.2d 1037 (1996); Commonwealth v. Blount, 538 Pa. 156, 647 A.2d 199 (1994); Commonwealth v. Tilley, 528 Pa. 125, 595 A.2d 575 (1991); Commonwealth v. Porter, 524 Pa. 162, 569 A.2d 942, cert. denied, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990). Accordingly, no relief is due.
Second, Appellant suggests that counsel was ineffective for failing to object and ask for a cautionary instruction when Melissa Harrington testified during cross-examination that Appellant used to sell cocaine. See N.T., 10/4/94, at 50.[16]
We note that such a claim of ineffectiveness may not be evaluated in hindsight. Commonwealth v. Williams, 537 *33 Pa. 1, 28, 640 A.2d 1251, 1264-65 (1994) (citations omitted). Rather, all that we need determine is whether the course of action chosen by trial counsel at the time of trial had some reasonable basis designed to effectuate his client's best interests, and, if so, we will deem counsel effective and our inquiry ends. Commonwealth v. Buehl, 540 Pa. 493, 510, 658 A.2d 771, 780 (1995) (citations omitted).
Commonwealth v. Speight, 544 Pa. 451, 461, 677 A.2d 317, 322 (1996); see also Commonwealth v. Clemmons, 505 Pa. 356, 479 A.2d 955 (1984).
In the instant case, it is apparent that defense counsel's decision not to object could reasonably have been based on a desire to avoid calling attention to Harrington's statement, which might have gone relatively unnoticed by the jury. Moreover, in light of the properly admitted evidence establishing his guilt, Appellant has failed to demonstrate how this fleeting and undetailed reference to his prior conduct could have effected the outcome of the trial. Accordingly, no relief is due. See Commonwealth v. Buehl, 540 Pa. 493, 506 n. 6, 658 A.2d 771, 778 n. 6 (1995) (counsel not ineffective for failing to object to references to defendant's making of death threats, attempt to hire out for murder, and possession of illegal weapons; prejudice was minimal); Howard; Commonwealth v. Pierce, 515 Pa. 153, 163, 527 A.2d 973, 977 (1987) (defense counsel not ineffective for eliciting testimony concerning defendant's prior incarceration; prejudice was minimal).
Third, Appellant argues that counsel was ineffective for failing to object to the prosecution's bolstering of the testimony of Officer Gerard Smith. This claim fails.
After the robbery and shooting, Officer Smith reported to the police Internal Affairs Division to give a statement, as is required when any police officer fires his weapon. On direct examination at trial, Smith stated that he heard two or three gunshots prior to the shooting of Tracey Lawson. On cross, defense counsel noted that Smith's Internal Affairs statement made no mention of those shots. See N.T., 10/3/94, at 122-25. On re-direct, the prosecution responded to defense counsel's *34 attempted impeachment by bolstering Smith's trial testimony with prior consistent statements from the preliminary hearing, where Smith did mention the two or three gunshots in question.
Appellant argues that defense counsel was ineffective for failing to object to the prosecution's use of Smith's preliminary hearing testimony. He claims that the use of that testimony was improper because it did not antedate Smith's allegedly inconsistent prior statement, given in the Internal Affairs report. Appellant bases his claim on language from this Court's decision in Commonwealth v. Fisher, 447 Pa. 405, 290 A.2d 262 (1972), wherein we stated: "[i]n an effort to dispel the effect of prior inconsistent statements it is possible to rehabilitate a witness by showing that he had made prior statements antedating the prior inconsistent statement, and consistent with his testimony at trial. McCormick, Evidence s 49 (1954)." Fisher, 447 Pa. at 415, 290 A.2d at 268, quoted in Commonwealth v. Berrios, 495 Pa. 444, 452, 434 A.2d 1173, 1177 (1981).
It is not necessary to address Appellant's argument under Fisher; his ineffectiveness claim fails because he has failed to demonstrate that he was prejudiced to the extent that the outcome of the trial was effected. Initially, we note that Smith's report to Internal Affairs and his trial testimony were not truly inconsistent. The information about the two or three gunshots was simply not included in the statement to Internal Affairs, making it an omission, not an inconsistency.[17] Further, by attempting to impeach Smith, defense counsel was implying that he had either fabricated the statement about the gunshots or, at a minimum, that his memory was suspect. *35 The prosecution's demonstration on re-direct that Smith's preliminary hearing testimony matched his trial testimony had no effect on this theory other than to shift the time frame of Smith's fabricating (or remembering) to some point between his report to Internal Affairs and his appearance at the preliminary hearing. In other words, the defense theory was that Smith, for whatever reason, had altered his view of the events at some point after giving his report to Internal Affairs. At what point the alleged alteration actually occurred is a tangential question having no effect on the viability of the theory. Indeed, on re-cross, defense counsel again attempted to impeach Smith, this time focusing on the period between the Internal Affairs statement and the preliminary hearing:
[DEFENSE COUNSEL]: Here is my question. Somewhere along the line before the preliminary hearing that took place in December, and [the Internal Affairs statement given] in January, almost a year less a month [before], when was it that you remembered about the kind of gun it was and the shooting that you say you left out? When was it that you remembered all of that?
* * *
[DEFENSE COUNSEL]: Last question. You testified [about the two or three shots you heard] as the D.A. asked you back in December of '93 [at the preliminary hearing] and you remembered it then. Why didn't you go back to the Internal Affairs and say wait a minute, I just testified in a court under oath and I left something out, I want to add something. Why didn't you do that?
N.T., 10/3/94, at 159, 161. Given the above, we find that the defense theory was not impaired by the prosecution's use of Smith's preliminary hearing testimony and that Appellant suffered no prejudice thereby. Accordingly, his ineffectiveness claim fails.[18]See Howard.
*36 Appellant next argues that he was denied a fair trial because the prosecutor attempted to elicit hearsay while questioning Detective Charles Permint.[19]
In the course of trying to locate and arrest Appellant, Detective Permint spoke to Appellant's mother and grandmother, and to an employee of a bar near Appellant's mother's house. At trial, the prosecution asked Permint if Appellant's grandmother had given him any information on Appellant's whereabouts and on the type of contact she had had with Appellant. See N.T., 10/6/94, at 42-43. Permint was also asked whether Appellant's mother had given him any information on where Appellant could be found and whether she had seen him recently. See id. at 45-46. The prosecutor also asked Permint why he went to a bar near Appellant's mother's house and what happened when he got there. See id. at 47.
Appellant claims that these questions were an attempt to elicit hearsay testimony and that "[b]ecause of this improper, prejudicial course of conduct by the Commonwealth, [Appellant] must be afforded a new trial." Appellant's Br. at 31. We disagree. An examination of the record reveals that defense counsel objected to each of the questions that Appellant now complains of and that the trial court sustained those objections. Thus, no evidence was admitted in response to any of the questions. Moreover, the jury was instructed at the outset of trial that counsel's questions do not constitute evidence. See N.T., 9/27/94, at 132. Given this, Appellant has simply failed to demonstrate how he was denied a fair trial. *37 Accordingly, his claim fails.[20]
Citing Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), Appellant next argues that the trial court erred in refusing to include in its guilt phase jury charge an instruction that the penalty for second-degree murder is life imprisonment without parole. This claim fails. The trial court properly denied defense counsel's request for the instruction because sentencing considerations are not relevant during deliberations on the degree of guilt. Moreover, an examination of the court's jury charge indicates that it clearly and adequately set forth the law governing Appellant's case. See N.T., 10/11/94, at 5-41. No more was required. See, e.g., Commonwealth v. Snoke, 525 Pa. 295, 301-02, 580 A.2d 295, 298 (1990) ("The trial judge is required to instruct the jury as to the applicable law of the case. There is no requirement for the trial judge to instruct the jury as requested by either counsel if the issue is not in dispute or the law is not applicable to the case." (citations omitted)).
Appellant's reliance on Simmons is misplaced. Simmons held that an instruction that a life sentence excludes the possibility of parole is mandated at a capital sentencing hearing when the prosecution has argued the issue of the defendant's future dangerousness as an aggravating circumstance. See Simmons, 512 U.S. at 156, 114 S.Ct. at 2190; Commonwealth v. Christy, 540 Pa. 192, 656 A.2d 877 (1995). Simmons *38 is simply inapposite to jury instruction during the guilt phase. No relief is due.
Lastly, Appellant raises several issues regarding the penalty phase of his trial. First, he claims that defense counsel was ineffective for not objecting to the prosecution's cross-examination of Appellant's grandmother. This claim is meritless.
During the penalty phase, defense counsel presented the testimony of Appellant's grandmother, his mother, and his brother Elijah. Appellant's grandmother testified that Appellant was abused as a child, that she had fought for custody of him, that he had always respected her and been good to her, and that, as an adult, he visited her nearly every day. On cross-examination, the prosecution questioned the grandmother about her knowledge of Appellant's prior convictions for auto theft. Appellant suggests that there was no evidentiary basis for the prosecutor's cross-examination. He claims that his prior convictions were irrelevant, did not rebut his grandmother's testimony, and were raised in an attempt to prejudice him in the eyes of the jurors. He claims that a new penalty hearing is in order because counsel's failure to object to the cross-examination constituted ineffective assistance of counsel.
We disagree. Appellant's underlying claim lacks merit. On direct, the following exchange occurred between defense counsel and Appellant's grandmother:
[DEFENSE COUNSEL]: With regard to any prior  I say this to you, any prior convictions, on your [grand]son, does that involve and does this involve a larceny of an automobile, theft of a car?
[GRANDMOTHER]: An automobile, maybe, yeah. Nothing else.
N.T., 10/11/94, at 59. This questioning raised the car theft issue, thereby opening the door to the prosecution's subsequent cross-examination.[21] Moreover, "`a character witness *39 may be cross-examined regarding his knowledge of particular acts of misconduct by the defendant to test the accuracy of his testimony and the standard by which he measures reputation.'" Commonwealth v. Smith, 539 Pa. 128, 135, 650 A.2d 863, 867 (1994) (quoting Commonwealth v. Peterkin, 511 Pa. 299, 318, 513 A.2d 373, 383 (1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987)), cert. denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995).
Despite this, Appellant seems to suggest that the prosecution's cross-examination was improper because the prosecutor stated in the presence of the jury that Appellant had four convictions for auto theft, a fact that was not established on the record.[22] This claim entitles Appellant to no relief. The jury was instructed on more than one occasion *40 that counsel's questions were not evidence. See N.T., 9/27/94, at 132; 10/12/94, at 13-14. Further, we find it unlikely that the jurors disregarded those instructions, and the court's clear and accurate charge at the end of the penalty phase, and imposed the death penalty based on a belief that Appellant had four car theft convictions instead of one, as defense counsel's direct examination of Appellant's grandmother had suggested. See, e.g., Commonwealth v. Johnson, 542 Pa. 384, 401, 668 A.2d 97, 105 (1995) (jury presumed to follow court's instructions) (citing Commonwealth v. Steele, 522 Pa. 61, 78, 559 A.2d 904, 913 (1989)), cert. denied, ___ U.S ___, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996). No relief is due.[23]
Appellant next argues that he was denied a fair penalty hearing by virtue of prosecutorial misconduct during closing argument. We disagree.
[C]omments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and a hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination. Commonwealth v. Simmons, 541 Pa. 211, 245-46, 662 A.2d 621, 638 (1995).
*41 Johnson, 542 Pa. at 404, 668 A.2d at 107; see also Commonwealth v. Travaglia, 541 Pa. 108, 134, 661 A.2d 352, 365 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Moreover, "[a]t the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument. The prosecutor may `present argument for or against the sentence of death' and may employ oratorical license and impassioned argument." Travaglia, 541 Pa. at 134, 661 A.2d at 365 (citations omitted); see also Commonwealth v. Baker, 531 Pa. 541, 558, 614 A.2d 663, 671-72 (1992).
In his closing, the prosecutor stated that "[y]ou [jurors] will never get to meet Tracey Lawson" and that "[y]ou won't know about his dreams, his hopes, his aspirations" and, further, that "Tracey Lawson will never enjoy life, never enjoy any aspect of life." N.T., 10/12/94, at 18, 19. Given that Lawson had been killed, these comments were obviously reasonable inferences drawn from the evidence in the case. As such, they cannot be said to have denied Appellant a fair penalty hearing.
Next, Appellant takes issue with the prosecution's display to the jury of the victim's bloodied security guard uniform and the accompanying statements that "[t]his is what [Appellant] did to that man" and "[t]hat's all that's left of Tracey Lawson in this courtroom." Id. at 21. No relief is due. An examination of the record makes clear that the uniform was displayed to the jury for only a brief moment. See id. And, as the trial court recognized in overruling defense counsel's objections, the prosecutor's actions and comments were derived from the evidence presented in the case.
Appellant also argues that the following statements by the prosecution denied him a fair penalty hearing:
You heard from Anthony Washington's mother and grandmother. At the very end of their testimony they made an appeal to you to spare his life. And I was struck by the irony of it. Won't Mrs. Lawson, his brother, his sister, his children, won't they have loved the opportunity to argue or *42 to ask of Anthony Washington like you were asked in this courtroom by his family members, please don't kill my father, please don't kill my brother.
* * *
These folks were never given an opportunity to plead for [the] life of their loved one.
Id. This claim fails. While we do not condone these comments, or the manner in which they were apparently delivered,[24] we cannot conclude that the prosecutor's actions were so inflammatory that they rendered the jury incapable of objectively weighing the evidence. The comments were expressly made in response to the pleas for leniency made by Appellant's mother[25] and grandmother.[26] Even though they were apparently delivered with unnecessary theatrics, they were within the bounds of permissible penalty phase argument. See Commonwealth v. Jones, 546 Pa. 161, 206, 683 A.2d 1181, 1203 (1996) (permissible for prosecutor to state that murder victims' families "would feel exactly the opposite" of defendant's family members, who had asked the jury not to impose death penalty; and that when victims were killed "nobody was there to plead for them.") (citing Commonwealth v. Basemore, 525 Pa. 512, 529, 582 A.2d 861, 869 (1990), cert. denied, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992)). Moreover, the trial court specifically instructed the jury in its charge that their verdict must be based on the evidence and not on any appeal to sympathy or prejudice. See N.T., 10/12/94, at 36, 41.
The prosecutor also asked the jury *43 to give Anthony Washington the same sympathy and mercy that he showed to Tracey Lawson when he gunned him down in cold blood right between the eyes, right in the head. I would ask you to consider the following. While Tracey Lawson lay on a cold supermarket parking lot with his right eye hanging out, his left leg twitching involuntarily 
Id. at 22. The defense objected at this point, but the court properly overruled the objection. In Commonwealth v. Basemore, 525 Pa. 512, 530, 582 A.2d 861, 870 (1990), cert. denied, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992), this Court held that it is permissible during the penalty phase for a prosecutor to ask the jury to show the defendant the same mercy he showed the victim. See also Jones, 546 Pa. at 207-09, 683 A.2d at 1204. Further, the comments on Lawson's physical condition after the shooting were simply a reiteration of properly admitted evidence in the case, as the trial court noted when it denied defense counsel's objection.
Next, Appellant takes issue with the following statement by the prosecutor:
[w]hile [Lawson] lay on that sidewalk dying, . . . Anthony Washington sat at a table with Derrick Teagle, full of money, laughing. While Tracey Lawson's widow got the phone call that no one should ever get, went to that hospital and saw her husband in a condition no one should ever have to see. He was laughing. When she had to make that decision to disconnect him from the respirator, knowing that he would die, he laughed.
See N.T., 10/12/94, at 23. This statement was apparently delivered forcefully, as the trial court noted:
[w]ell, the Court Reporter will never be able to show that there is a tremendous inflection of the tone of the voice, certain key words in the phraseology, but nevertheless in accordance with my instructions, the District Attorney is advised that you may argue to the jury but you may not try to inflame their passion by the use of the tone of your voice.
Id. at 23-24. No relief is due. We cannot conclude that the prosecutor's statement had the unavoidable effect of stripping *44 the jury of its objectivity. The comment fell within the bounds of permissible argument at the penalty phase, where the prosecution is permitted to engage in "oratorical flair and impassioned argument." Travaglia, 541 Pa. at 134, 661 A.2d at 365. We also note again that the jury was instructed that their verdict must be based on the evidence, not on an appeal to sympathy or prejudice. See N.T., 10/12/94, at 36, 41.
Finally, Appellant questions the propriety of the trial court's response to a statement made by defense counsel during closing argument. The complained-of comment occurred during the following exchange:
[DEFENSE COUNSEL]: [Y]ou [the jury] have the right and that power to decide whether or not you agree on a death penalty on an individual or that you mandate life, which is life without a parole.
[PROSECUTOR]: Objection. Objection.
THE COURT: That's an improper comment right now because it's not the state of the law.
[DEFENSE COUNSEL]: Okay.
THE COURT: Jury is to disregard it.
[DEFENSE COUNSEL]: Okay. That he is to be sentenced to life imprisonment.
Id. at 31.
Appellant claims that he was denied a fair penalty hearing because the trial court's statement left the jury with the incorrect conclusion that there was parole from a life sentence. This claim fails. Immediately after its statement, the trial court directed the jury to disregard defense counsel's "life without a parole" comment, thereby removing the parole issue from the jury's consideration. See Johnson, 542 Pa. at 401, 668 A.2d at 105 (jury is presumed to follow trial court's instructions); Commonwealth v. Tilley, 528 Pa. 125, 143, 595 A.2d 575, 583 (1991) (same). Then, in its final charge, the court instructed the jury that its verdict should be based only an objective evaluation of the aggravating and mitigating circumstances presented. See N.T., 10/12/94, at 36-41. And, in any event, it is clear that the trial court did not misstate the *45 law, given that life imprisonment is not a certainty where a life sentence is imposed. See 71 P.S. § 299(e)-(g) (Supp.1997). We find no reversible error.
Having concluded that Appellant's claims for relief are without merit, we must affirm the judgment of sentence unless we determine that
(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;
(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or
(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.
42 Pa.C.S. § 9711(h)(3) (Supp.1997).
Upon review of the record, we conclude that the sentence was not the product of passion, prejudice or any other arbitrary factor. Rather, it was based upon evidence properly admitted at trial. We also conclude that the evidence was sufficient to support the jury's finding of one aggravating circumstance, that the killing occurred during the perpetration of a felony. See id. § 9711(d)(6). This conclusion is amply supported by the eyewitness testimony of Juana Robles, Suphea Phongsak, and Officer Gerard Smith.
Lastly, we have reviewed Appellant's sentence in light of the sentencing data compiled and monitored by the Administrative Office of the Pennsylvania Courts. See Commonwealth v. Frey, 504 Pa. 428, 475 A.2d 700, cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). We conclude that the sentence of death imposed upon Appellant is not excessive or disproportionate.
Accordingly, we affirm the judgment of sentence.[27]
ZAPPALA, J., concurs in the result.
NOTES
[1] Teagle was convicted of second-degree murder, robbery, simple assault, possessing an instrument of crime, and criminal conspiracy. In total, he was sentenced to life in prison, plus ten to twenty years. On appeal, the Superior Court affirmed. See Commonwealth v. Teagle, No. 152 Philadelphia 1995, 455 Pa.Super. 660, 686 A.2d 1368 (Pa.Super. Sept. 16, 1996).
[2] See 18 Pa.C.S. § 2502(a) (1983).
[3] See id. § 3701.
[4] See id. § 2701(a).
[5] See id. § 907 (Supp.1997).
[6] See id. § 903 (1983).
[7] See 42 Pa.C.S. § 9711(d)(6) (Supp.1997) (the killing occurred during the perpetration of a felony).
[8] See id. § 9711(e)(8) (1982) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.").
[9] The trial court sentenced Appellant to fifteen to thirty years imprisonment for the robbery charges, to be served consecutive to the sentence of death. No sentences were imposed for the remaining charges. See N.T., 12/9/94, at 16.
[10] Pursuant to 42 Pa.C.S. § 9711(h)(1) (Supp.1997) and Pa. R.A.P. 1941.
[11] The decision whether to sever the trials of co-defendants is within the sound discretion of the trial court and will not be reversed on appeal absent a manifest abuse of that discretion. See Commonwealth v. Wharton, 530 Pa. 127, 142, 607 A.2d 710, 717 (1992). The decisive question is whether Appellant was prejudiced by the trial court's decision. See Wharton, 530 Pa. at 142, 607 A.2d at 717-18. The burden is on Appellant to establish such prejudice. See Commonwealth v. Lambert, 529 Pa. 320, 331, 603 A.2d 568, 573 (1992).
[12] The trial court stated:

Members of the jury, I have to make something abundantly clear to you. You have been told before that when a person makes a statement and that statement is read to you that it's evidence only against that person. That means that if the District Attorney is making a closing argument and he refers to a statement by Mr. Teagle, anything in that statement or any inferences from that statement can only be used against Teagle. That means that if the next bit of argument talks about the other Defendant, you're not to infer that by any means or stretch of the imagination that the person who is blanked out happens to be the other one just because the way the arguments are being presented to you. Because you're not allowed to infer from the statement who Blank is.
N.T., 10/7/94, at 98.
[13] The trial court stated:

The cautionary instruction is the same as before. That is if you want to prove that two people acted together [or] they didn't, then you have eyewitnesses to testify about how two people acted together and that's supported from what he saw, but you cannot use a statement of one person against anybody else. It's only against the person who made it. I can't make it any clearer than that.
Id. at 102.
[14] In a related claim, Appellant takes issue with the prosecution's invitation to the jury to "read the statement, Ladies and Gentlemen," to "read the statement to determine what it is," and to "[r]ead the statement." Id. at 96, 102, 103. Appellant suggests that the prosecution's comments were improper because he knew the jury could not take Teagle's statement into deliberations. He further claims that these comments were another impermissible attempt to use Teagle's statement to demonstrate Appellant's guilt. He forwards these arguments in support of a claim that defense counsel was ineffective for not specifically objecting to the three above-quoted comments.

This claim is meritless. To establish the ineffective assistance of counsel, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness. See Commonwealth v. Howard, 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994). For the reasons already discussed in the body of this opinion, we find no merit to Appellant's underlying claim of prosecutorial misconduct. Moreover, we believe that the prosecution's invitation to the jury to "read" Teagle's statement was simply a rhetorical device intended to convey the prosecution's belief that the details of the statement were clear and unequivocal. Further, we note that the jury did not take Teagle's statement into their deliberations. Thus, we find that Appellant has failed to establish the prejudice necessary to support his claim of ineffectiveness. Accordingly, the claim fails.
[15] Appellant also argues that the prosecutor, at one point, was preparing to launch "a scurrilous, ad hominem attack on defense counsel." Appellant's Br. at 18. The record provides no support for this claim. At the moment in question, the following exchange occurred:

[PROSECUTOR]: It reminds me of a movie I saw once. The scene was a criminal setting. The defendant on trial was a well-respected, well-regarded pillar of the community. . . . The defendant, this pillar of the community, stood accused of murder of a young man, poor, from the wrong side of the tracks, because that young man insulted this well-respected, well-regarded pillar of the community. And for that indignity, the defendant struck him with his cane and killed him. . . . The only witness to the murder was this young man's elderly grandmother. Simple woman. She had just finished testifying, telling the jury what had happened the night that her grandson insulted this pillar of the community and this man struck her grandson with the cane and smashed his skull. And the defense attorney stood up and approached the 
[DEFENSE COUNSEL]: Objection.
[TEAGLE'S COUNSEL]: Objection.
THE COURT: Sustained.
Id. at 106.
After examining this passage, we are unable to perceive the "scurrilous" attack on defense counsel that Appellant suggests was imminent. In any event, Appellant has failed to demonstrate how the prosecutor's words deprived the jury of its ability to render a true verdict. See LaCava; Bond. Thus, his claim fails.
[16] The complained-of testimony went as follows:

[DEFENSE COUNSEL]: Not criticizing, just trying to  as a piper, you're talking about, so we know, buying the cocaine, putting it in a pipe, lighting it and then smoking it; is that correct?
[HARRINGTON]: Your client used to sell it.
[DEFENSE COUNSEL]: Pardon me?
[HARRINGTON]: He used to sell it.
[DEFENSE COUNSEL]: I'm talking about you using it.
[HARRINGTON]: Yes.
[DEFENSE COUNSEL]: But you said you were a piper. I'm just trying to say where a piper is, you take the cocaine, put it in a pipe and smoke it?
[HARRINGTON]: Yes.
N.T., 10/4/94, at 50.
[17] See In the Matter of Silverberg, et al., 459 Pa. 107, 117, 327 A.2d 106, 112 (1974) ("It is elementary that a prior statement may be used to impeach a witness' credibility only if that statement is in fact inconsistent with the witness' testimony at trial."), cert. denied sub nom. Oxman v. Pennsylvania, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 849 (1982); Commonwealth v. Hill, 378 Pa.Super. 562, 569, 549 A.2d 199, 203 (1988) ("It is well settled that omissions of facts in prior statements do not render them inconsistent statements that may be used for impeachment purposes at trial."), appeal denied, 522 Pa. 618, 563 A.2d 887 (1989).
[18] On cross-examination, defense counsel also attempted to impeach Officer Smith by noting that in his statement to Internal Affairs Smith gave no details concerning the shooter's height, weight, or features, he indicated only that the gunman was a black male in his early twenties. See N.T., 10/3/94, at 114-15. Appellant argues that counsel was ineffective for not objecting to the prosecution's use of Smith's preliminary hearing testimony to bolster his trial testimony on that point. The record, however, indicates that the prosecution did not mention Smith's description of the shooter at any time during re-direct. See id. at 147-56. Thus, there simply was no "improper bolstering" of Smith's trial testimony on that point. Accordingly, Appellant's claim fails.
[19] Detective Permint was a member of the "fugitive squad." His testimony was intended to establish the fact that Appellant avoided arrest out of consciousness of guilt. See, e.g., Commonwealth v. Gorby, 527 Pa. 98, 112-13, 588 A.2d 902, 909 (1991) (evidence of flight relevant and admissible to establish an inference of guilt).
[20] In an undeveloped claim presented in a footnote, Appellant indicates that defense counsel did not object to every question the prosecutor asked of Permint. He then argues that, to the extent that counsel should have objected to the prosecutor's questions and failed to do so, he was ineffective. See Appellant's Br. at 30 n. 9. After a thorough review of the record, we find this claim to be meritless. Permint's answers to the questions defense counsel did not object to were either derived from his personal observations, were ambiguous, or were admissible as information offered to explain police conduct. See N.T., 10/6/94, at 42-52; Commonwealth v. Hamilton, 543 Pa. 612, 617, 673 A.2d 915, 918 (1996) ("It is well-established that certain out of court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the truth of the matter asserted, but rather to show the information upon which the police acted."); Commonwealth v. Jones, 540 Pa. 442, 451, 658 A.2d 746, 751 (1995) (same). No relief is due.
[21] The cross-examination, in relevant part, was as follows:

[PROSECUTOR]: Okay. You said your grandson had some convictions. Do you know how many?
[GRANDMOTHER]: No, I said I didn't know how many. Maybe a car. I never knew any convictions he had.
[PROSECUTOR]: Isn't it in fact . . . that your grandson Anthony Washington has been convicted four times previously for stealing cars?
[GRANDMOTHER]: I don't know that.
[PROSECUTOR]: You don't know that?
[GRANDMOTHER]: No, I don't.
[PROSECUTOR]: He doesn't talk to you about those things?
[GRANDMOTHER]: No, he doesn't.
N.T., 10/11/94, at 61.
[22] Although there was no testimony or documentary evidence verifying Appellant's four prior convictions, it is apparent that defense counsel accepted the accuracy of the prosecution's information, as the following exchange just prior to closing arguments at the penalty phase makes clear:

[DEFENSE COUNSEL]: Your Honor, after our conference I had requested the Court to withdraw as one of the mitigating circumstances the [lack of a] significant history of felony convictions. . . . Based upon information that I have received from [the prosecution],. . . I thought that that was the proper way to go in this case, to remove it and it has been removed.
* * *
[PROSECUTOR]: . . . I informed [defense counsel] that if he intends to present that mitigating circumstance to the Jury for their consideration, I intended to present evidence that [Appellant] has four prior convictions for [car] theft. . . .
N.T., 10/12/94, at 3. The jury was not present when this discussion occurred.
[23] During closing argument at the penalty phase, the prosecution made reference to the fact that Appellant's grandmother did not know that Appellant had four convictions for auto theft. After defense counsel objected, the court gave a cautionary instruction and directed the jury to disregard the prosecutor's comment. The prosecutor then stated that there were "some things about [Appellant] that his grandmother doesn't know about or doesn't want to know about." N.T., 10/12/94, at 14. Defense counsel again objected, and the court charged the jury that it was to consider as evidence only information coming from the witness stand. The prosecutor then essentially repeated his statement that there were "things" about Appellant that his grandmother wasn't aware of. Id. Defense counsel objected, and the court again charged the jury that they could only consider evidence of record.

Appellant argues that the prosecutor's remarks denied him a fair penalty hearing. In light of the trial court's prompt cautionary instructions, we cannot conclude that the unavoidable effect of the prosecutor's comments was to prejudice the jurors to a point where they were unable to objectively weigh the evidence. Accordingly, we reject Appellant's claim. See LaCava; Bond.
[24] In sustaining defense counsel's objection to these comments, the trial court stated on the record: "Hystrionics [sic], acting, walking over, standing behind the Defendant that he can't even see and pointing fingers at him are totally inappropriate as closing arguments. You may argue to the jury from the evidence or lack thereof and that's it." N.T., 10/12/94, at 21.
[25] See N.T., 10/11/94, at 68.
[26] See id. at 60.
[27] The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. See 42 Pa.C.S. § 9711(i) (Supp.1997).