**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 789 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on February 12, |
| | : | 2020 in the Court of Common Pleas, |
| v. | : | Westmoreland County, Criminal |
| | : | Division at No. CP-65-CR-0005539- |
| | : | 2017. Post-Sentence Motions |
| RAHMAEL SAL HOLT, | : | denied August 21, 2020 |
| | : | |
| Appellant | : | SUBMITTED: October 13, 2021 |

*Justice Donohue delivers the Opinion of the Court as to Parts I, III, IV, V(A), V(C), V(E), VI, VII, VIII, IX and X and announces the Judgment of the Court with respect to Parts II, V(B) and V(D). The Opinion is joined in full by Chief Justice Baer and Justice Todd. Justice Dougherty files a concurring opinion, joined by Justices Mundy and Brobson.*

**OPINION**

**JUSTICE DONOHUE** **DECIDED: April 28, 2022**

This is a direct appeal from appellant Rahmael Holt's sentence of death. We affirm.

**I. Factual History**

On November 17, 2017, Patrolman Brian Shaw of the City of New Kensington Police Department was shot and killed in the line of duty. At 8:06 p.m. Officer Shaw informed dispatch that a vehicle had failed to stop for his lights and sirens. Shortly afterwards, Officer Shaw announced that he was pursuing on foot. Moments later he

radioed that he had been shot. Because no one witnessed the shooting, the Commonwealth established Holt's guilt through circumstantial evidence, including the testimony of Tavon Harper, the driver of the vehicle Officer Shaw attempted to stop. We summarize the facts adduced by the Commonwealth.

Harper testified that he moved to New Kensington sometime around August 24, 2017, the day he was released from prison after serving a sentence for robbery. He lived at 1105 Kenneth Avenue with his then-wife, Morgan Harvin. On the day of Officer Shaw's murder, Harper initiated a video call with Vanessa Portis, "a girl that [he] talked to socially." However, Rahmael Holt answered, who Harper recognized as they had attended elementary and middle school together. The two talked, and Holt asked if Harper had any drugs. Harper said he could sell him some cocaine after he showered. N.T., 11/5/2019, at 243. Holt texted that Harper should meet him at 1206 Victoria Avenue. When Harper arrived, Holt walked next to the vehicle and showed a gun, which Harper said looked like a .40 caliber pistol. *Id.* at 247. After buying the cocaine, Holt asked if Harper could sell him some marijuana. Harper told him he would try to get some.

Later that afternoon, Harper met a friend in McKeesport who sold marijuana. Harper bought the drugs and made his way back to New Kensington. Holt bought the marijuana and then asked Harper to drive him to a nearby convenience store. Shortly after leaving the store, Harper heard and saw police sirens. Harper did not pull over, explaining in his testimony that his home on Kenneth Avenue was nearby and he intended to park there. Officer Shaw pursued the vehicle and radioed its license plate.

During the pursuit, Holt pulled a gun from underneath his jacket and asked Harper to hide it. Harper declined because he was on parole and feared going back to prison.

He told Holt to get out and run. After a brief vehicular pursuit, Harper turned onto Leishman Avenue. Holt, still holding the pistol, jumped out of the vehicle and ran. Harper saw a police officer chase Holt. He then closed the passenger door and drove back to his house on Kenneth Avenue.

Nicole Drum, who resided at 1237 Leishman Avenue, testified that she heard gunshots and went to her window. Directly across from her home is a parking lot and the City Reach Church. She observed someone running down the alley behind the church parking lot. Video footage from Drum's home and the church were obtained, which together showed the following. Officer Shaw's patrol vehicle is seen pursuing a Jeep, which disappears from the camera's view. Moments later, a male who cannot be clearly identified runs on the sidewalk with Officer Shaw pursuing at a close distance. Both individuals can be seen turning into the church parking lot. A muzzle flash is seen, but the footage does not otherwise indicate anything about the shooting.

Officer James Noble testified that he heard Officer Shaw report on the radio that a vehicle was failing to yield. Officer Noble responded to the given location, which was one block over and parallel to Officer Noble's police car. Officer Shaw reported that the vehicle turned onto Leishman Avenue and "[a]t some point he had indicated that he had one running, which I believe was a foot pursuit in progress." N.T., 11/4/2019, at 71. Officer Noble then proceeded to the 1200 block of Leishman, which was the last location given by Officer Shaw. As he arrived at the intersection of Catalpa and Leishman, he heard several gunshots. Officer Noble then exited his vehicle and quickly located Officer Shaw, who was on the ground. He went to render aid and observed that Officer Shaw's

firearm holster still had its flap closed, meaning that it had not been drawn.[1]  Despite emergency measures, Officer Shaw died.  Jennifer Summers, M.D., performed the autopsy and testified to a reasonable degree of medical certainty that Officer Shaw primarily died from blood loss, with the accumulation of blood outside of his lungs and within the chest cavity as a secondary cause.  N.T., 11/7/2019, at 781.

Multiple police forces and agencies investigated.  Thomas Klawinski, an agent employed by the Office of Attorney General, told the jury that at approximately 9:30 p.m. he received word that a cell phone had been found on Victoria Avenue, which runs parallel to Leishman Avenue and is separated from Leishman Avenue by Equator Alley.  Agent Klawinski retrieved the cell phone, which was powered on and appeared operational, from the backyard of 1204 Victoria Avenue.  The straight-line distance between Officer Shaw's body and the yard was measured as approximately 165 yards.  N.T., 11/5/2019, at 184.  Meanwhile, authorities quickly closed in on Harper based on the license plate relayed by Officer Shaw.  Detective Ray Dupilka of the Westmoreland County District Attorney's office received a call at approximately 10:30 p.m. informing him that the Jeep had been located at 1105 Kenneth Avenue.  Detective Dupilka then proceeded to that address, where officers had already contacted Harper and Harvin.

Harper and Harvin both testified at trial that they jointly decided to lie and tell the police that Harvin had been driving the Jeep.  The next day, she told police that she had lied, and that Harper was the driver.  Harper eventually admitted to driving the Jeep and claimed that the passenger was known on the street as "Reese."  Harper denied that he was in regular communication with Reese.  The next morning, authorities searched the

---

[1]  Officer Shaw's firearm's magazine was fully loaded and one round was in the chamber.

phone recovered from the backyard of 1204 Victoria Avenue and learned that the device had been in contact with Harper's phone on multiple occasions on November 17. Harper was then arrested.

At that point, Harper provided more details, including identifying the passenger as Holt. He indicated that after closing the passenger door, he parked the Jeep at home because he knew the police had the license plate and would find the vehicle. *Id.* at 276. He then took Harvin's Nissan to 1206 Victoria Avenue where he saw Holt standing in the doorway. Holt said, "I'm fucked … I dropped my phone." *Id.* at 295. Harper took Holt to another location then returned to Kenneth Avenue.

Multiple people testified to Holt visiting 1206 Victoria Avenue shortly after Officer Shaw was shot. Michael Luffey and his fiancée, Holly Clemons, lived there along with Lakita Cain, Cain's daughter Taylor Mitchell, and Cain's niece Antoinette Strong. Luffey testified that Mitchell and Holt were in a relationship and that Holt stayed over most evenings. The night of the shooting, Luffey and Clemons came home and saw Holt on the second floor. Luffey observed Mitchell trying to bandage Holt's right hand, which was bleeding. Holt left within thirty minutes of Luffey's arrival. Clemons testified that Holt appeared nervous and was pacing. He left and "got into some type of dark-colored vehicle" and did not return. N.T., 11/6/2019, at 493. Antoinette Strong testified that she was inside the home and heard gunshots outside. N.T., 11/7/2019, at 661. Approximately three minutes later, she heard knocking. *Id.* She opened the backdoor and Holt asked if Lakita Cain was home. *Id.* at 664. Holt came in and went to the basement, which did not function as a living space. A few minutes later, Holt went upstairs to Cain's room. Strong returned to her room and did not see Holt again. *Id.* at 665-66.

The Commonwealth also presented evidence suggesting that Holt made efforts to have others remove evidence from 1206 Victoria Avenue.[2] Luffey testified that on November 18, 2017, he came home in the afternoon and saw Lisa Harrington, a relative of Holt's, speaking to Cain. After smoking a cigarette on the porch, Luffey saw "Lisa … taking a paper bag out of the house[.]" N.T., 11/6/2019, at 426. Harrington then left. Clemons also testified to this interaction, saying that she was in the residence when Harrington arrived. Cain "ma[de] a comment that she had to get her story together." *Id.* at 499. According to Clemons, Harrington arrived with several other people. Clemons saw Harrington leave with a purse and told the others "to wait here, she would be right back." *Id.* at 501. Harrington was gone approximately fifteen minutes before returning. Clemons asked Cain what was happening, and Cain replied, "she had … to get stuff out of the house." *Id.* at 502. Cain "did say that there was, like, a gun in the basement." *Id.* at 503. Clemons did not see either woman go to the basement. Antoinette Strong saw both women go to the basement and observed Harrington leave the house carrying a purse. N.T., 11/7/2019, at 671-72.

Holt was apprehended on November 21, 2017. N.T., 11/8/2019, at 928. The Commonwealth presented extensive evidence of Holt's movements after the shooting. Vanessa Portis, the owner of the phone recovered from 1206 Victoria Avenue, testified that she bought the phone for Holt and put its service on her T-Mobile plan. At 8:38 p.m. on the night Officer Shaw was murdered, Portis received a phone call from Lisa

---

[2] Holt raises an issue concerning the introduction of statements by Lakita Cain, who did not testify, via the co-conspirator exception to the rule prohibiting the introduction of hearsay. We discuss the particular statements in greater detail within that section of the opinion.

Harrington. At 8:48 p.m., she received another phone call from Harrington's phone, but Holt was on the line. Holt informed her that he had lost his phone. She called T-Mobile at 8:49 p.m. and cancelled his line.[3] Shortly after 9 p.m., Portis went to her home. As she arrived, "they [Holt and Harrington] pulled up directly behind me two seconds later." N.T., 11/6/2019, at 544. At Holt's request, Portis took Holt to Holt's mother's home, where they stayed for approximately two and one-half hours. Afterwards, Portis dropped Holt off "somewhere in Penn Hills." *Id.* at 554.

Aysa Benson testified that Holt arrived at her home in Duquesne on November 18, 2017 between 10 a.m. and noon. Benson lived there with Holt's cousin, Marcel Mason. Holt stayed there throughout the day. Around 11:30 p.m., Benson saw on the news that Holt was wanted in connection with Officer Shaw's murder. She and Mason told Holt that he had to leave. Benson took Holt to Mason's brother's house on 5005 Ladora Way in Hazelwood, where Holt was ultimately apprehended. After dropping Holt off, Benson returned home. The next day, she provided Mason with a prepaid cell phone at Mason's request. That phone was seized when Benson was arrested for hindering apprehension. The phone sent multiple text messages to a phone recovered at 5005 Ladora Way, including a message saying, "[E]rase everything in your old phone and tell Aysa … To go upstairs, get them pants I had and throw them away. My ID in there. Get rid of." *Id.* at 919-20.

Finally, the Commonwealth presented ballistics evidence. Detective Todd Roach recovered five bullet casings from the parking area next to the City Reach Church crime

---

[3] Glenn Bard, an expert in digital forensics, analyzed phone records and supplied the precise times. *See generally* N.T., 11/8/2019, at 933-72.

scene. N.T., 11/7/2019, at 692, 700. Agent Klawinski discovered a sixth casing the next day. *Id.* at 812. Agent Klawinski discovered parts of two bullets lodged in the exterior of 1237 Leishman Avenue. *Id.* at 815, 819. A third bullet fragment was recovered from 1243 Leishman Avenue. *Id.* at 752-53. Dr. Summers testified that she found two bullets in Officer Shaw's body during her examination. The first entered the left shoulder and perforated the lung on the left side. *Id.* at 778-79. The second bullet entered the back of the officer's left shoulder and lodged near his right armpit. *Id.* at 779. These items were turned over to Detective Roach, along with a third bullet that was lodged in Officer Shaw's bullet resistant vest. *Id.* at 732-33.

Corporal Robert Hagins testified as an expert in firearm and toolmark examination. He concluded that four bullets—the two recovered from Officer Shaw's body, one from his vest, and one bullet from 1237 Leishman—were all discharged from the same firearm and were .40 caliber class bullets. N.T., 11/8/2019, at 866-67. He could not determine if the other bullet pieces recovered from the homes were fired from the same firearm. He did, however, opine that all six casings discovered in the church parking lot were fired from the same firearm. *Id.* at 859. The corporal also explained that the firearm operator can suffer injuries due to "slide bite." "[A]n improper grip on the firearm will allow … the bottom of the slide, which has sharp edges and is not to go against skin. That will ride on the web of the shooter's hand between the index finger and thumb and can cause a bite in this manner." *Id.* at 871.

Holt was charged by criminal information with murder of a law enforcement officer of the first degree, murder of the first degree and two violations of the Pennsylvania

Uniform Firearms Act,[4] the first as a person not to possess a firearm and the second for carrying a firearm without a license.[5]  On January 19, 2018, the Commonwealth filed notice of its intent to seek the death penalty.  Trial Court Opinion, 8/12/2020, at 1.  The defense and Commonwealth filed pretrial motions, regarding various issues including the introduction of evidence of Holt's prior possession of firearms and the disclosure of the defense's expert mitigation report.  The trial court held hearings addressing the pretrial motions on various dates between May 21, 2018 and October 28, 2019.

Thereafter, a jury trial was held.  Following the six-day jury trial, at which the Commonwealth presented the above-described evidence, Holt was convicted of all charges.  Verdict Slip, 11/12/2019, at 1.  At the penalty phase, the Commonwealth presented testimony from the victim's mother and brother; the defense presented evidence from a neighbor of Holt and a pastor who ran a youth program that Holt attended from the ages of six to fourteen.  N.T. 11/13/2019–11/14/2019, at 19-80.  The jury found the existence of a single aggravating circumstance, namely that Officer Shaw was a peace officer murdered while in the line of duty, 42 Pa.C.S. § 9711(d)(1).  Sentencing Verdict Slip, 11/14/2019, at 3.  The jury also determined that Holt established the existence of the catch-all mitigating circumstance, and in the sentencing verdict slip, referred specifically to Holt's "lack of parental guidance growing up, [being] raised in a high crime environment and [the] violent death of his brother."  *Id.*; 42 Pa.C.S. § 9711(e)(8).  The jury determined that the aggravating circumstance outweighed any mitigating circumstances and recommended a sentence of death.  Sentencing Verdict

---

[4]  18 Pa.C.S. §§ 6101–6128.

[5]  18 Pa.C.S. §§ 2507 (a); 2502 (a); 6105 (a)(1); 6106 (a)(1).

Slip, 11/14/2019, at 3. Thereafter, the trial court formally imposed a sentence of death, followed by an aggregate sentence of ten and a half to twenty-seven years of imprisonment for the violations of the Pennsylvania Uniform Firearms Act. Sentencing Court Order, 2/12/2020.

Holt filed post-sentence motions, raising, inter alia, a claim that his conviction for first-degree murder was against the weight of the evidence. Post-Sentence Motions, 2/25/2020, at 2. The trial court denied the post-sentence motions on August 21, 2020. Trial Court Opinion and Order, 8/21/2020. Holt filed a notice of appeal, and, upon order of the trial court, a timely statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) raising eight issues for appeal. He raised claims regarding the sufficiency of the evidence; claiming that the verdict of death was the product of passion, prejudice and arbitrariness; arguing the admission of evidence of his prior possession of firearms violated Pennsylvania Rule of Evidence 404(b); asserting the trial court erred in denying his motion for severance of counts; asserting the trial court erred in allowing Cain's testimony to hearsay; asserting that the trial court erred in requiring the defense to disclose the mitigation report prior to the conclusion of the guilt phase; and raising a claim that the death penalty in Pennsylvania is unconstitutional. Rule 1925(b) Statement, 11/20/2020, at 1-6.

Holt raises nine claims on appeal.

## II. Sufficiency of the evidence

Holt's first two claims involve the sufficiency of the evidence to convict and the weight of the evidence.

Holt's first issue addresses the sufficiency of the evidence to support his conviction for homicide of a law enforcement officer. 18 Pa.C.S. § 2507(a). The elements of this crime are identical to murder of the first degree with the added elements that the victim (1) is killed while in the performance of duty and (2) that the actor knew the victim is a law enforcement officer. The only element challenged by Holt is the applicable mens rea of intentionality.[6] "To convict a defendant of first degree murder, the Commonwealth must establish a human being was unlawfully killed, the defendant was responsible for the killing, and the defendant acted with malice and a specific intent to kill." *Commonwealth v. Perez*, 93 A.3d 829, 841 (Pa. 2014).

Holt argues that the evidence presented established "only that the shooter shot recklessly at Officer Brian Shaw as he was running away during a police pursuit following an attempted traffic stop." Holt's Brief at 20. According to Holt, the reckless acts of the shooter[7] cannot support the requisite specific intent. Holt maintains that he was only "shooting on the run, not squaring up to fire back at the pursuing victim." *Id.* at 19 (citation omitted). Holt supports this argument with citation to the Commonwealth's forensic

---

[6] "A person commits murder of a law enforcement officer of the first degree who intentionally kills a law enforcement officer while in the performance of duty knowing the victim is a law enforcement officer." 18 Pa.C.S. § 2507(a). While Holt does not challenge the other elements of the crime, "[i]n capital direct appeals, this Court conducts an independent review of the sufficiency of the evidence supporting the first-degree murder conviction, even if the defendant does not challenge evidentiary sufficiency[.]" *Commonwealth v. Knight*, 156 A.3d 239, 244 (Pa. 2016). The evidence presented establishes that Officer Shaw died, that he was in the performance of his duties, and that Holt knew Officer Shaw was a law enforcement officer.

[7] Holt's defense at trial was that he was not the shooter, and his current brief consistently refers to the assailant as "the shooter." Simultaneously, the jury obviously determined that Holt was the shooter, and Holt does not challenge that conclusion for purposes of challenging the sufficiency of the evidence.

pathologist, alleging that she "confirmed that the pathological evidence was consistent with the shooter not facing the victim and shooting as he was running away." *Id.* Additionally, the location of the bullet casings from the first to the fifth "were [twenty-two] feet apart" and therefore "consistent with the shooter running away and not stopping and deliberately and intentionally taking aim at the pursuing officer." *Id.* Additionally, Holt argues that Officer Shaw "was not shot in the head or heart or a vital part" of his body. *Id.* The pathologist identified the cause of death as blood loss and opined that the bullets did not puncture Officer Shaw's lungs. *Id.* In sum, Holt argues that the Commonwealth's evidence established only that Holt wildly fired his gun in the general direction of Officer Shaw. In legal terms, he contends that he acted so recklessly that his actions demonstrated a callous indifference regarding the possibility that Officer Shaw would die, making him guilty of murder in the third degree. *Id.* at 21 ("There was simply no evidence of specific intent to kill as is required to sustain the first-degree murder conviction in this capital murder case. Third degree, yes. First degree, no.").

The Commonwealth responds with the legal proposition that "specific intent to kill may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body." Commonwealth's Brief at 9 (citing cases). The Commonwealth submits that Officer Shaw was struck in a vital part of his body, as three bullets hit his torso, one of which was stopped by the officer's vest while another perforated a lung. The Commonwealth also disputes Holt's averment that he was merely reckless in firing the gun. It cites as factually similar *Commonwealth v. Washington*, 700 A.2d 400 (Pa. 1997), wherein Washington turned and fired a gun at an unarmed security guard who was chasing Washington and his co-defendant following a botched robbery. This Court

affirmed the conviction for first-degree homicide. The Commonwealth argues that the present facts more strongly indicate an intent to kill, as Holt fired multiple shots at Officer Shaw.

Our standard of review follows the United States Supreme Court's approach as articulated by *Jackson v. Virginia*, 443 U.S. 307 (1979), which holds that the Due Process Clause as incorporated by the Fourteenth Amendment requires that all convictions be supported by "sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Id*. at 316. We follow that approach, as stated in *Commonwealth v. Brown*, 52 A.3d 1139 (Pa. 2012):

> This Court follows the *Jackson* approach in determining whether evidence is sufficient to support a conviction beyond a reasonable doubt. First, our standard of review, like the *Jackson* standard, recognizes the proper regard an appellate court must give to the fact-finder's evaluation of all of the evidence received at trial and, therefore, requires scrutiny of the totality of that evidence "in the light most favorable to the Commonwealth, as verdict winner," *Commonwealth v. Sanchez,* 589 Pa. 43, 58, 907 A.2d 477, 486 (2006), and to "draw all reasonable inferences in favor of the Commonwealth." *Commonwealth v. Fisher,* 491 Pa. 231, 234, 420 A.2d 427, 428 (1980). Further, our Court's determination of the ultimate question of evidentiary sufficiency parallels the central inquiry under the *Jackson* standard, namely, whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *see also Commonwealth v. Reed,* 605 Pa. 431, 436, 990 A.2d 1158, 1161 (2010) (sufficiency determination depends on whether a reasonable trier of fact could have found every element of the crime was established beyond a reasonable doubt).

*Id*. at 1164 (footnote omitted).

We find that the Commonwealth presented sufficient evidence to enable a rational trier of fact to conclude that Holt specifically intended to kill Officer Shaw. To the extent

that the Commonwealth asks the Court to affirm based solely on the fact that Officer Holt was struck in vital parts of his body, we decline to do so. There is no doubt that intentionally striking a vital part of the body with a deadly weapon is, by itself, sufficient for a fact-finder to infer the specific intent to kill. For example, in *Commonwealth v. Rodgers*, 456 A.2d 1352, 1353 (Pa. 1983), the cause of death was "a shotgun blast from a distance of three (3) to five (5) feet to the face of the victim." As we observed, "The nature of the killing, a shotgun blast to the head at short range, establishes the specific intent to take life." *Id.* at 1354.

We agree that the bullets struck Officer Shaw in vital body parts. *See*, *e.g.*, *Commonwealth v. Talbert*, 129 A.3d 536, 543 (Pa. Super. 2015) ("The gunshot wounds suffered by both victims were inflicted on vital parts of the body including the head, chest, and lung."). However, this is not a straightforward case like *Rodgers*, where the "nature of the killing" leaves no room to question whether the actor intentionally aimed the weapon at the victim. The validity of the inference that striking a vital body part with a bullet is sufficient evidence of intent to kill rests on the intentional use of the weapon to achieve that result. For example, a person firing a gun blindly through the woods for amusement may strike an unseen hunter in the heart. A rational fact-finder could not conclude that the fact a bullet struck a vital part of the body established a specific intent to kill. In *Commonwealth v. Drum*, 58 Pa. 9 (Pa. 1868), we stated: "He who uses a deadly weapon upon another at some vital part, with manifest intention to use it upon him, must in the absence of qualifying facts be presumed to know that his blow is likely to kill, and must be presumed to intend death." *Id.* at 9.

Thus, the fact that a victim suffered injuries to a vital body part is not dispositive for a sufficiency analysis. There must also be other evidence demonstrating that the shooter manifestly intended to use the weapon upon the victim. Affirming the verdict based solely on the fact that a vital body part was struck would be in dereliction of *Jackson* and the Due Process Clause, as we are required to review all the evidence. *See Jackson*, 443 U.S. at 319 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review **all of the evidence** is to be considered in the light most favorable to the prosecution."). Holt correctly observes that there is no direct testimony concerning how he deployed his weapon. We therefore decline to uphold the verdict based solely on the fact that at least one bullet struck a vital body part.

Nonetheless, examining all the evidence we find that the Commonwealth presented sufficient evidence. Drawing all inferences in favor of the Commonwealth as verdict winner, the jury could have determined that Holt fired six bullets in rapid succession. Three of these bullets struck Officer Shaw. Together, those facts are indicative of an intent to kill. In *Commonwealth v. Padgett*, 348 A.2d 87, 88 (Pa. 1975), the defendant was charged with murder. He took the stand and testified that he shot the victim at a distance of approximately six feet "and admitted pointing the weapon at the arm of the victim in jest." *Id*. at 90. The bullet entered the victim's arm and proceeded through her heart. Padgett argued that the inference of a specific intent to kill based on striking a vital body part was negated because he shot only her arm. We disagreed. "[W]e are not persuaded that it must be shown that the bullet fired from a revolver, a deadly weapon, initially entered a vital organ before the inference of specific intent to kill

can arise. The firing of a bullet in the general area in which vital organs are located can in and of itself be sufficient to prove specific intent to kill beyond a reasonable doubt." *Id.* at 88 (citing *Commonwealth v. Gidaro*, 70 A.2d 359 (Pa. 1950)).[8] The *Gidaro* case likewise cited the fact that a person fires a gun towards another human being as supporting a "reasonable inference" of an intention to kill. "When any person standing [sixteen] feet from another person points a loaded gun at that person's chest area and pulls the trigger, the reasonable inference is that he intended to take that person's life." *Gidaro*, 70 A.2d at 362.

While this case lacks direct evidence that Holt intentionally aimed his gun at Officer Shaw, as was the case in *Padgett* and *Gidaro*, a rational fact-finder could conclude beyond a reasonable doubt that he did so. That three of the six bullets fired struck Officer Shaw is circumstantial evidence permitting an inference that Holt in fact aimed his weapon at Officer Shaw. The Commonwealth, as verdict winner, is also entitled to the reasonable inference that Holt fired at close range. The video evidence showed Officer Shaw was roughly six to seven feet behind Holt. Multiple officers testified that Officer Shaw radioed that he had been shot shortly after stating that he had started a foot chase. It is obvious that aiming a gun at a human being and firing multiple shots at close range can result in death. "[W]e know of no proposition more consistent with human experience

---

[8] *Padgett* predates *Jackson* and our decision did not explicitly state whether we assessed the sufficiency of the evidence in light of Padgett's testimony. In separately addressing Padgett's argument that the Commonwealth failed to establish the requisite mens rea due to his testimony that he was intoxicated, we observed that "the Commonwealth's expert testified that there were powder burns on the decedent's clothing, indicating that the weapon had been fired at point-blank range, thus establishing another conflict in appellant's testimony and allowing the jury to properly infer that the shooting had been intentional." *Padgett*, 348 A.2d at 89.

than the conclusion that absent circumstance to the contrary, a person intends the natural and probable consequences of his act." *Commonwealth v. O'Searo*, 352 A.2d 30, 37 (Pa. 1976). Moreover, the fact that those bullets struck vital body parts, while not conclusive, is certainly a fact that the jury could consider in determining whether Holt deliberately aimed his firearm at Officer Shaw as opposed to wildly firing the gun in Officer Shaw's general direction. In combination, these circumstantial facts warranted the inference that Holt acted with the specific intent to kill. *See Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) ("The Commonwealth may use solely circumstantial evidence to prove a killing was intentional[.]").

Holt rejects the validity of these inferences by positing that he shot recklessly, based primarily on the fact that the distance from the first to fifth ammunition casings was twenty-two feet, and the expert testimony of Dr. Summers. Beginning with the former point, Detective Roach explained that the majority of the time cartridge cases are ejected "out the right side of the weapon," and can go different distances, from "a couple of inches" to "up to 10 to 15 feet[.]" N.T., 11/7/2019, at 701. As to Dr. Summers' testimony, while Holt claims that she "confirmed" that the evidence was consistent with Holt not facing the victim and shooting as he was running away from Officer Shaw, the expert did not do so. Dr. Summers merely said that she could not say one way or the other. She testified, "[T]here's nothing about the injuries that lets me know which direction the person firing the shots was looking at the time that they fired the gun." N.T., 11/7/2019, at 787-88.

The jury could certainly have determined that Holt fired his gun in the manner described in his brief, but it was not required to accept Holt's favored inferences.[9]

Relatedly, Holt's argument that he is guilty only of third-degree homicide asks this Court to weigh the evidence for itself. The sufficiency inquiry "does not require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (quotation marks and citation omitted). The jury is entrusted with deciding the facts, and what Holt intended when he fired the gun is quintessentially a factual determination. "As intent is a subjective frame of mind, it is of necessity difficult of direct proof." *Commonwealth v. Matthew*, 909 A.2d 1254, 1257 (Pa. 2006) (citation omitted). We find that the Commonwealth presented sufficient evidence.[10]

## III. Weight of the evidence

---

[9] As the trial court recognized, there are no facts of record to establish that Holt was firing the weapon recklessly. Its opinion explained:

> The Defendant asserts that he was running, and not aiming, but that assertion is nowhere in the record in this case. The Defendant did not testify. Although video surveillance captured the incident on camera, because the shots were fired in a darkened parking lot, the manner and position of shooter and victim were not discernible.

Trial Court Opinion, 8/21/2020, at 16.

[10] The Commonwealth claims that in *Commonwealth v. Washington* we upheld the conviction "despite Washington's claim of mere recklessness[.]" Commonwealth's Brief at 10. However, the opinion does not contain any reference to recklessness, and the second paragraph of the opinion states that "Appellant does not challenge the sufficiency of the evidence[.]" *Washington*, 700 A.2d at 404. Our review of the sufficiency was based on our duty "to review the record to determine whether the Commonwealth has established the elements necessary to sustain a conviction for first-degree murder." *Id.* (citation omitted).

"A weight challenge is *sui generis.* Such a claim is not premised upon trial court error or some discrete and correctable event at trial, but instead ripens only after, and because of, the jury's ultimate verdict in the case." *Criswell v. King*, 834 A.2d 505, 512 (Pa. 2003). As a result, a claim asserting that the verdict was against the weight of the evidence rests within the trial court's discretion. *Commonwealth v. Houser,* 18 A.3d 1128, 1135 (Pa. 2011). We review the trial court's exercise of discretion in ruling on the claim, and not whether the verdict was against the weight of the evidence. *Id.* The trial court is required to consider whether the jury's verdict "is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative[.]" *Commonwealth v. Clemons*, 200 A.3d 441, 463 (Pa. 2019). Holt raises ten assertions in support of his claim that the trial court erroneously denied his weight motion.

> 1. The prosecution's key witness, Tavon Harper, who was released from prison and state parole a few weeks after this trial, despite the Commonwealth and Harper misrepresenting that he had no plea agreement with the prosecution to testify, lied repeatedly in statements provided prior to his trial testimony ([N.T., 11/5/2019, at] 323-24) and was not a credible witness.

> 2. Five casings were located [twenty-two] feet apart by investigating detectives, indicating the shooter shot back recklessly at Officer Shaw, as he ran from him. There was no gun residue on the body, indicating no close-range shots were fired.

> 3. The testimony of Holly Clemons and Michael Luffey was tainted by threats to take away their kids if they did not cooperate and testify.

> 4. The testimony of Antoinette Strong, who testified repeatedly she arrived at Cain's residence at 9:00 pm on the night of the murder, one hour after Officer Shaw was shot, and

made observations that could not have been made at that time ([N.T., 11/7/2019, at] 676-77).

5. The allegation that [Holt] cut his hand while firing a semiautomatic weapon was rebutted by photos produced at trial of both hands uncut and without sign of injury at the time of his arrest.

6. There was no eyewitness to the murder of Brian Shaw.

7. The video displayed in court did not identify [Holt].

8. No murder weapon was produced.

9. [Holt] did not confess.

10. There was no DNA or other scientific evidence linking [Holt] to this murder.

Holt's Brief at 22-23 (reordered).

This list of complaints unaccompanied by any substantive argument impedes meaningful review, and two of these points are subsumed within other appellate issues. Regarding Tavon Harper's alleged plea deal, there is no factual support for this claim on the record. Concerning the bullet casings, Holt raised this point when challenging the sufficiency of the evidence to support the mens rea of intentionality.

The remaining eight assertions reduce to an allegation that someone other than Holt committed the crime, which was Holt's primary defense at trial. "Mr. Holt has maintained from day one since capture that he is innocent." N.T., 11/4/2019, at 43. The absence of DNA evidence, a confession, a direct eyewitness or video recording of the murder, and a murder weapon are not dispositive because the Commonwealth may establish guilt through entirely circumstantial evidence, "so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v.*

*Hardcastle,* 546 A.2d 1101, 1105 (Pa. 1988). "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). When ruling on a weight claim, the trial court must determine whether "certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009). The points discussed above do not point to contrary facts but rather cite the Commonwealth's failure to present certain facts.

To the extent that these assertions generically challenge the weight of the evidence with respect to linking Holt to the identity of the shooter, Harper's testimony, if accepted by the jury, itself provided a sufficient basis to implicate Holt as the shooter. As the trial court observed, "Testimony from Tavon Harper established that Holt possessed a handgun with a 'long magazine' immediately before the traffic stop and testified that Holt 'jumped out' of the vehicle on Leishman Avenue with the pistol in his hand and he watched Officer Shaw pursue him on foot." Trial Court Opinion, 8/12/2020, at 19. The trial court also cited circumstantial evidence presented by the Commonwealth, including the testimony by multiple residents of 1206 Victoria Avenue that placed Holt at the residence shortly after shots were heard and the cell phone discarded at 1204 Victoria Avenue which was linked to Holt.[11] The trial court also cited the evidence of flight and

---

[11] Holt's argument that Luffey and Clemons were untrustworthy witnesses because the authorities threatened to take away their children if they did not cooperate bore on their credibility. "We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974). On direct examination, the Commonwealth asked Luffey to explain how he came to contact the FBI with information.

that continued attempts to evade law enforcement suggested a consciousness of guilt. We agree that the weight given to Harper's testimony and the circumstantial evidence presented was for the jury. *Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses.").

Holt is correct that some of the testimony conflicts with other evidence. Strong testified that she arrived home after 9 p.m., and the Commonwealth presented several pieces of evidence showing that Officer Shaw was murdered approximately twenty minutes beforehand. However, "[a] new trial should not be granted because of a mere conflict in the testimony[.]" *Widmer*, 744 A.2d at 752. What effect the minor discrepancy in recalling the timing of the events had upon other portions of Strong's testimony was for the jury to decide. *DeJesus*, 860 A.2d at 107. Likewise, the assertion that photographs of Holt's hand objectively establish that he did not suffer any injuries did not convince the trial court that a new trial was warranted. Both Strong and Luffey testified that they observed Holt with an injury to his hands consistent with the "slide bite" injuries described by Corporal Hagins. The fact that those injuries were, according to Holt, not depicted in the photographs taken after Holt's capture was a potential conflict[12] in the testimony for the jury to weigh. *Id.* In any case, Holt was not apprehended immediately, and Holt does

---

He replied, "Well, after [authorities] had been there a couple of times they had told us that if we withhold anything from them, any information from them, you know, we could lose our kids. We could end up in jail ourselves." N.T., 11/6/2019, at 418. Counsel was entitled to cross-examine on this matter, and any issue within the scope of that examination would implicate collateral review.

[12] The certified record does not include any of the exhibits presented at trial, and thus we have no basis to say what the photographs do or do not show.

not account for the fact that the injuries may have healed. Based on its review of Harper's testimony and the circumstantial evidence, the trial court concluded that the "verdict as rendered by the jury is not so contrary to the weight of the evidence that it shocks this court's sense of justice[.]" Trial Court Opinion, 8/12/2020, at 21. We find no abuse of discretion.

## IV. Failure to disclose plea deal

Next, Holt alleges that the Commonwealth had an undisclosed agreement with Harper that he would testify at trial in exchange for the dismissal of his outstanding charges and his release from custody. Holt's Brief at 23-24. Holt draws attention to the fact that Harper was being held in the Westmoreland County Jail for the two years leading up to Holt's trial and faced felony drug charges and a parole revocation. N.T., 11/5/2019, at 232. Shortly after testifying, Harper was released from custody and the charges against him were dismissed. Holt's Brief at 24. Holt asks this Court to infer from the circumstances that there was a plea agreement, arguing that "[i]t offends one's sense of justice and defies logic to conclude that [Harper] did not have an agreement with the prosecution to set him free by testifying against [Holt]." *Id.* at 26. Holt complains that the Commonwealth's failure to disclose the alleged plea agreement violates the principle established in *Brady v. Maryland*, 373 U.S. 83 (1963) and continued in *Giglio v. United States*, 405 U.S. 150, 154 (1972). He contends that the jury could have been "significantly influenced" by Harper's undisclosed plea bargain and may have rejected Harper's testimony and rendered a different verdict as a result. *Id.* at 27.

In *Brady,* the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process

where the evidence is material to either guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To succeed on a *Brady* claim, a petitioner must demonstrate (1) that the prosecutor suppressed evidence; (2) that the evidence is helpful to the petitioner, either because it is exculpatory or impeaching; and (3) that prejudice ensued. *Commonwealth v. Lambert*, 884 A.2d 848, 854 (Pa. 2005). Notably, "when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule." *Giglio*, 405 U.S. at 154 (*citing Napue v. Illinois*, 360 U.S. 264, 269 (1959)). *See also Commonwealth v. Natividad*, 200 A.3d 11, 25-26 (Pa. 2019) (reciting *Brady* standard).

The Commonwealth "expressly denies that any agreement existed prior to Holt's trial or Harper's testimony." Commonwealth's Brief at 15. It states that Harper acknowledged in his testimony that he was not promised that his cooperation and testimony would be rewarded in his own criminal cases. *Id.* The Commonwealth also argues that Holt waived this claim because he failed to raise it before the trial court. *Id.* at 16.

Significantly, *Brady* claims are subject to waiver. *Commonwealth v. Hannibal*, 156 A.3d 197, 209-10 (Pa. 2016) (failure to raise *Brady* claim at trial or on direct appeal resulted in waiver); *Commonwealth v. Roney*, 79 A.3d 595, 609 (Pa. 2013) (*Brady* issues which could have been raised at trial and/or on direct appeal but were not, were waived for collateral review). Despite being aware of the facts underlying his claim, Holt did not raise a *Brady* claim before the trial court. Instead, he recited the facts underlying this claim in his Pa.R.A.P. 1925(b) statement in support of a claim he entitled "the verdict of

death was a product of passion, prejudice and arbitrary factors." *See* Holt's 1925(b) statement, 11/20/2020, ¶ 8.[13] In his Rule 1925(b) statement, Holt attacked Harper's credibility by stating that Harper "was released from prison and parole a few weeks after trial, despite the prosecution and Harper claiming he had no plea agreement with the prosecution to testify," and also asserting that Harper "lied repeatedly" in his pre-trial statements. *Id.* Holt attacked Harper's credibility to support his weight of the evidence claim. Holt did not raise the present claim – a *Brady* claim based on the Commonwealth's failure to disclose Harper's alleged plea agreement – in his Rule 1925(b) statement or at any point before the trial court. He did not claim that Harper had a secret plea agreement or assert that the prosecution suppressed evidence of such a plea agreement. Thus, the Commonwealth is correct that the claim is waived. Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").[14]

### V. Evidence of Holt's prior possession of firearms

(A)

---

[13] As with the list included in his appellate brief, paragraph eight of Holt's Rule 1925(b) statement commences with "[t]here was no eyewitness to the murder…" and concludes by asserting that the allegation that he cut his hand while firing the weapon was rebutted by photographic evidence at trial. Compare Holt's Brief at 22-23 with Holt's 1925(b) statement, 11/20/2020, ¶ 8. Thus, these factual assertions (including the assertions regarding Harper's lack of credibility) are raised in his Rule 1925(b) statement in support of his claim that the verdict was against the weight of the evidence.

[14] *Brady* claims may also be waived for lack of development. *Commonwealth v. Briggs*, 12 A.3d 291, 326 n.34 (Pa. 2011) (deeming a *Brady* claim waived for lack of development); *Commonwealth v. Yandamuri*, 159 A.3d 503, 527-28 (Pa. 2017) (defendant waived *Brady* claim by failing to identify the particular evidence withheld). Holt's claim is subject to waiver for that reason as well, in that he does not identify any particular evidence withheld from him, but merely relies on supposition.

Prior to trial, the Commonwealth filed notice of its intention to present testimony from Michael Luffey that he had seen Holt in possession of a semi-automatic firearm prior to the shooting.[15] The Commonwealth stated that the evidence would demonstrate Holt's access to a firearm and motive to murder a pursuing police officer to avoid charges for the illegal possession of the firearm. Commonwealth's Motion in Limine, 9/30/2019, ¶¶ 7(d), 12. Holt objected, arguing that the evidence was inadmissible evidence of prior bad acts. Defendant's Response to Commonwealth's Motion in Limine, 10/22/2019, ¶¶ 7(d) (citing Pa.R.E. 404(b)). The trial court ruled that the evidence was admissible, and the Commonwealth proceeded to introduce the evidence at trial. N.T., 10/23/2019, at 15-21. Luffey testified that he saw Holt in possession of a black firearm twice in the weeks leading up to the shooting. N.T., 11/6/2019, at 399-403. According to Luffey, on the first occasion, he observed Holt in possession of a .40 caliber black firearm with a loaded clip. *Id.* at 400-01. On the other occasion, he observed what he believed to be a different weapon in the waistline of Holt's pants. *Id.* at 402-03.

Pursuant to Rule 404(b), "[e]vidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). Nonetheless, this evidence may be admissible for another purpose, such as to prove motive, opportunity, or intent. Pa.R.E. 404(b)(2). When introduced for another purpose, this evidence is admissible only if its probative value outweighs its potential for unfair prejudice. Pa.R.E. 404(b)(2).

---

[15] Pursuant to Rule 404(b)(3), the prosecutor must provide reasonable notice of its intent to introduce any such evidence at trial. Pa.R.E. 404(b)(3).

Courts routinely admit evidence that on another occasion, the defendant possessed the weapon used to commit the crime. In *Commonwealth v. Towles*, 106 A.3d 591 (Pa. 2014), this Court determined that a defendant's prior requests to see and use the handgun used to commit a killing "demonstrated appellant knew where the handgun was located, had the ability to retrieve it, and was familiar with it due to his prior use of it[.]" *Id.* at 603. This "other act evidence" – the defendant's prior possession of a weapon – may be relevant to demonstrate the defendant's access to the weapon and opportunity to commit the crime that is charged. One commentator recounted that "[o]ne of the most common fact patterns employing 'opportunity' reasoning involves the admission of uncharged misconduct evidence that helps establish that a person had the means by which to commit a crime, especially a weapon that was used in the charged offense." David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct & Similar Events* § 11.7.1 (2d ed. 2019) (uncharged misconduct showing access to or possession of weapon or tools used to commit the charged act).

(B)

Pennsylvania courts, unlike those in other jurisdictions,[16] require the prosecution to make some connection between the weapon defendant previously possessed and the crime at issue to justify the "similar-weapons exception." In *Commonwealth v. Christine*, this Court stated, "the fact 'the accused had a weapon or implement suitable to the commission of the crime charged … is always a proper ingredient of the case for the

---

[16] *State v. Pena*, 22 A.3d 611, 617 (Conn. 2011) ("The state does not have to connect a weapon directly to the defendant and the crime. It is only necessary that the weapon be suitable for the commission of the offense.") (internal citations omitted); *People v. Fierer*, 529 N.E.2d 972, 979 (Ill. 1988) (holding that the State need not prove that the given weapon was the one actually used in order to make it admissible).

prosecution.'" *Commonwealth v. Christine*, 125 A.3d 394, 400 (Pa. 2015) (citing *Commonwealth v. Robinson*, 721 A.2d 344, 351 (Pa. 1998)). The Court explained that, to admit evidence that a defendant possessed a weapon suitable to the crime, the Commonwealth must "lay a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime." *Id.* (citing *Commonwealth v. Lee*, 662 A.2d 645, 652 (Pa. 1995)). There, the Court considered the admissibility of similar-weapons evidence (a shank) in a trial for aggravated assault arising out of a prison altercation and in which the injuries to the victim were caused by a razorblade. This Court determined that the defendant's possession of a shank did not qualify as similar-weapons evidence because it was not used in the pertinent assault. The Court explained that "[t]he theory of the exception is that the weapon possessed could have been the weapon used–that simply is not the case here[.]" *Id.* at 400-01. The Court reiterated the requirement that the Commonwealth lay a foundation to justify an inference that the weapon was the actual weapon used in the crime when it concluded: "To the extent that cases affirm use of this exception strictly on the basis of similarity, without an inference they were the weapons used, we reject them." *Id.*

In *Commonwealth v. Lee*, the similar-weapons exception was invoked to justify admission of evidence (two knives and a pair of scissors) to prove that the defendant was responsible for repeatedly stabbing and ultimately killing two victims. *Lee*, 662 A.2d at 649. The Court determined that the similar-weapon exception justified admission of evidence that two knives and a pair of scissors were seized from the defendant's mother's home, despite that it was never definitively established that these weapons were actually used in the commission of the killings. *Id.* at 649, 652. The Commonwealth introduced

evidence that the defendant was seen in the rooms from which the knives and scissors were recovered, as well as testimony from the medical examiner that the scissors and knives "were consistent with the puncture and stab wounds inflicted upon the victims." *Id.* at 652-53. In consideration of the evidence of the defendant's access to the weapons and the testimony from the medical examiner, we concluded that the trial court did not abuse its discretion in allowing admission of the evidence regarding the scissors and knife because "the Commonwealth laid a foundation to justify the inference that the scissors and knife seized by police could have been the murder weapons." *Id.* at 653.

Thus, under the similar-weapon exception, the Commonwealth must lay a foundation to justify an inference that the weapon was the actual weapon used. The exception will not justify admission of a weapon that cannot have caused the injuries, as was the shank in *Christine*. And a weapon may not be introduced solely based on similarity. Nonetheless, once the Commonwealth establishes a **likelihood** that the weapon evidence it seeks to admit was used in the commission of the crime, it is admissible. *Christine*, 125 A.3d at 400 (citing *Commonwealth v. Thomas*, 561 A.2d 699, 707 (Pa. 1989)). When the Court expressly rejected prior case law that applied this exception "strictly on the basis of similarity," it required the Commonwealth to lay a foundation to justify an inference that the weapon possessed on a prior occasion was used in the commission of the offense. *Id.* at 401. Further, the *Christine* Court clarified that the Commonwealth need only lay a foundation to justify an inference by the jury—it need not definitively establish that they are the same weapon. Instead, "uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence."

*Id.* at 400 (citing *Commonwealth v. Williams*, 640 A.2d 1251, 1260 (Pa. 1994) (citing *Commonwealth v. Coccioletti*, 425 A.2d 387, 390 (Pa. 1981))).

We must apply these principles to review the admission of Luffey's testimony that Holt possessed a firearm two to three weeks prior to the murder. We will reverse only if Holt shows that the trial court abused its discretion. *Commonwealth v. Gill*, 206 A.3d 459, 466-67 (Pa. 2019). This Court "will not find an abuse of discretion 'based on mere error of judgment, but rather … where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.'" *Id.* (citing *Commonwealth v. Eichinger*, 915 A.2d 1122, 1140 (Pa. 2007)).

Holt contends that the trial court abused its discretion in admitting this evidence, as its sole purpose was to demonstrate his criminal propensities. Holt's Brief at 27-32 (citing *Commonwealth v. Billa*, 555 A.2d 835, 840 (Pa. 1989) and Pa.R.E. 404(b)(1)-(2)). He acknowledges the test set forth in *Christine* permitting the admission of weapons evidence, but argues that the Commonwealth did not lay a foundation to justify an inference that the weapons possessed on the prior occasion were the weapon used in the commission of the crime here. *Id.* at 29-31. Further, Holt argues that the prejudice of their admission "greatly outweighed any pretense of probative value." *Id.* at 28. Holt asserts that the evidence that he illegally possessed a firearm on a previous occasion would prejudice the jury's deliberation over whether he illegally possessed the firearm on the date of the incident as charged in counts three and four of the criminal information. *Id.* at 29, 33; 18 Pa.C.S. § 6105 (a)(1) (prohibiting possession of a firearm by persons

who have been convicted of statutory enumerated offenses); 18 Pa.C.S. § 6106 (a)(1) (prohibiting concealed carry of a firearm without a lawfully issued license).

The Commonwealth emphasizes this Court's statement in *Christine* that "the fact 'the accused had a weapon or implement suitable to the commission of the crime … **is always a proper ingredient of the case for the prosecution**.'" Commonwealth's Brief at 20-21 (citing *Christine*, 125 A.3d at 400 (emphasis added by Commonwealth)). Relying on *Christine*, the Commonwealth asserts that Luffey's testimony demonstrated that Holt possessed a firearm[17] which bore sufficient similarities to the firearm used to kill Officer Shaw to raise an inference that it was the murder weapon. *Id.* at 22. The Commonwealth further argues that Luffey's testimony fell squarely within the permitted uses of evidence otherwise barred by Rule 404(b) because it addressed opportunity, motive and identity. *Id.* at 17-18. The Commonwealth asserts that Luffey's testimony demonstrates Holt's opportunity to commit the murder. More specifically, it demonstrates that Holt had "access to and familiarity with such a weapon in close temporal proximity to the crime." *Id.* at 20-22 (citing *Christine*, 125 A.3d at 400). As to motive, the Commonwealth argues that the testimony demonstrated that Holt was illegally in possession of a firearm which he could not conceal in the car, and once the officer began pursuing Holt, that officer presented an immediate threat to Holt's liberty should Officer Shaw discover the illegal firearm. *Id.* at 20. The Commonwealth states that it was vital to its case that the weapon was possessed illegally, because this fact establishes a motive for Officer Shaw's murder.

---

[17] The Commonwealth refers to a single firearm and does not address that Luffey, in his testimony, referred to two separate occasions when he viewed Holt with what he believed to be two different firearms.

*Id.* With regard to identity, the Commonwealth observes that, because Holt fled and was not apprehended at the scene, the identity of Holt as the shooter was at issue. *Id.* at 18.

In asserting that the probative value of the evidence outweighed its potential for unfair prejudice, the Commonwealth cites to a series of cases in which it claims the other crimes evidence was more inflammatory than the evidence introduced here. *Id.* at 25-26. For instance, in *Commonwealth v. Briggs*, 12 A.3d 291 (Pa. 2011), this Court held that evidence that the defendant had previously purchased a firearm was admissible as part of the sequence of events forming the history of the case, and also, was relevant to show the defendant's ability to acquire handguns. *Briggs*, 12 A.3d at 337-38. In *Commonwealth v. Towles*, this Court approved of the admission of evidence that the defendant had stolen and hidden a handgun in the alley near the murder scene because it demonstrated the defendant's familiarity with the handgun. *Towles,* 106 A.3d at 602. The Commonwealth asserts that in *Briggs* and *Towles*, "the 'other crimes' evidence was more inflammatory than the rather pedestrian testimony" challenged here. Commonwealth's Brief at 26. Further, the Commonwealth asserts that it limited its introduction of the evidence in this case by calling only one witness, Luffey, when multiple witnesses could have been called to testify that they witnessed Holt with a firearm immediately prior to the murder. *Id.* at 27.

(C)

Because Luffey's testimony addressed two occasions when he witnessed Holt in possession of what he believed to be two different firearms, we will address them separately. We find that the trial court did not abuse its discretion in admitting Luffey's testimony regarding his first viewing of Holt with a firearm. Luffey testified that he

observed Holt mere weeks before the shooting in possession of a firearm. N.T., 11/6/2019, at 399-403. Specifically, Luffey testified that he was familiar with firearms, and that based on his familiarity with firearms, he believed the firearm Holt possessed to be a .40 caliber black firearm. *Id.* The Commonwealth presented evidence demonstrating that the murder weapon in this case was a .40 caliber firearm. N.T., 11/5/2019, at 245-47; 11/8/2019, at 866-67. Through this evidence, the Commonwealth laid a proper foundation to justify an inference by the jury that when Luffey observed Holt in possession of a .40 caliber weapon at their dining room table weeks before the shooting, he observed Holt with the same weapon used in the commission of the offense. This evidence was relevant to demonstrate Holt's access to and familiarity with a .40 caliber firearm, and thus, his opportunity to commit the murder. Holt's attempts to attack Luffey's testimony to suggest that he did not observe the "actual weapon used in the crime" are the type of arguments that go to the weight of the evidence, and not its admissibility. *Christine*, 125 A.3d at 400 (citing *Coccioletti*, 425 A.2d at 290).

The probative value of the evidence that Luffey witnessed Holt in possession of a .40 caliber firearm shortly before the murder outweighed its potential for unfair prejudice. The evidence demonstrated that Holt had possession of the firearm shortly before the offense and thus, had access to the firearm to commit the shooting. *See* N.T., 11/6/2019, at 399-401. Aside from arguing that evidence of his possession of an illegal weapon is prejudicial, Holt does not point to anything prejudicial about the testimony. For these reasons, we agree with the trial court's rejection of Holt's contention that this "prior bad acts" evidence was being used as propensity evidence.

(D)

Luffey's testimony that he observed Holt with a firearm in the waistline of his pants on a second occasion was not properly admitted as it did not meet the requirements of Rule 404(b) delineated in *Christine*. Luffey testified that on some unspecified day he viewed Holt carrying a firearm in his waistband. N.T., 11/6/2019, at 402-03. He said this weapon did not appear to be the same weapon he saw on the first occasion, and Holt never removed the gun from his waistband. *Id.* Because the Commonwealth introduced no other evidence supporting an inference that this was the weapon used in the commission of the crime, we find that the court erred in admitting that evidence.[18] *Christine*, 125 A.3d at 400 (citing *Lee*, 662 A.2d at 652).

(E)

Its admission, however, was harmless error. In *Commonwealth v. Story*, 383 A.2d 155 (Pa. 1978), we announced that an error is harmless "only if the appellate court is convinced beyond a reasonable doubt that the error is harmless." *Id.* at 162. Further, "an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a reasonable possibility that

---

[18] The Concurrence suggests that we interpret *Christine* to mandate a "strict[ ] inference the weapon introduced was the **actual** weapon used." Concurring Op. at 3. Respectfully, we do not affirm the admission of the evidence based on an assessment of how strong the inference was; instead, we merely hold that under the facts of the case, where Luffey testified that he was familiar with a .40 caliber firearm, the Commonwealth satisfied its burden regarding that first occasion. We do not suggest that the Commonwealth's initial burden requires a witness to supply some basis to determine that the weapon observed was of the same caliber. *See Oliver v. City of Pittsburgh*, 11 A.3d 960, 966 (Pa. 2011) ("[V]arious principles governing judicial review protect against such slippage, including the axiom that the holding of a judicial decision is to be read against its facts."). Indeed, we note that on cross-examination the Commonwealth's own firearms expert agreed that it would be difficult to identify from a glance the caliber of a weapon. N.T., 11/8/2019, at 876. With respect to the second firearm, the Concurrence does not claim that Luffey's testimony satisfies the Commonwealth's burden under the similar-weapon exception.

an error might have contributed to the conviction, the error is not harmless." *Id.* (internal citations omitted). In *Commonwealth v. Fulton*, 179 A.3d 475 (Pa. 2018), we summarized the three scenarios in which an error may be found to be harmless:

> (1) [T]he error did not prejudice the defendant or the prejudice was de minimis; or
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* at 492-94. The Commonwealth bears the burden of proving that the error was harmless beyond a reasonable doubt. *Story*, 383 A.2d at 162 n.9. We may sua sponte invoke the harmless error doctrine "as it does nothing more than affirm a valid judgment of sentence on an alternative basis." *Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) (citing *Commonwealth v. Hicks*, 156 A.3d 1114, 1140 (Pa. 2017) (Baer, J., concurring)).

We find that the prejudice of the admission of Luffey's brief testimony that he observed Holt with a firearm in his waistband was de minimis. Given that the Commonwealth already introduced evidence that Holt possessed a firearm consistent with the murder weapon, the reference to Holt possessing another firearm would not have significantly influenced the jury. In both instances, the Commonwealth was seeking to establish the same point: that Holt possessed a firearm that was consistent with the murder weapon mere weeks before the murder and therefore, he had the opportunity to commit the murder. Although Luffey testified that he thought these were different firearms, the Commonwealth did not emphasize that point. Instead, it focused on how

Holt had access to firearms capable of committing the murder. Further, Holt does not draw our attention to any specific prejudice caused by Luffey's testimony. Thus, in light of the properly admitted evidence regarding Holt's possession of a .40 caliber firearm weeks before the shooting, we find that the reference to Holt possessing another firearm on a different occasion could not have contributed to the conviction.

## VI. Severance

Next, Holt argues that the trial court abused its discretion by denying his pretrial motion for severance of the counts related to illegal possession of a firearm[19] from the first-degree murder counts. At trial, the Commonwealth and defense stipulated that "on November 17, 2017, the Defendant was a person prohibited by Pennsylvania law from possessing, using or controlling a firearm, and that he had been so prohibited since May 8, 2012." N.T., 11/8/2019, at 906-07. The jury was not informed why Holt was disqualified from possessing a firearm.

Holt argues that he was prejudiced by the introduction of evidence that he was disqualified from possessing a firearm, contending that the stipulation invariably led the jury to assume that Holt "had committed some serious crime to disqualify him[.]" Holt's Brief at 45. While he acknowledges the court took measures to avoid prejudice by advising the jury via stipulation that Holt was disqualified from owning a firearm without describing the basis for Holt's disqualification, Holt contends that "the jury could easily read through that." *Id.*

---

[19] Holt was charged and convicted of violating section 6105(a)(1) of the Uniform Firearm Act, which provides that a person who has been convicted of one of the statutory enumerated offenses shall not, inter alia, possess or use a firearm in the Commonwealth. 18 Pa.C.S. § 6105(a)(1). He was also charged and convicted of violating section 6106(a)(1) of the Uniform Firearm Act, which makes it a felony of the third degree for a person to "carr[y] a firearm in any vehicle or … concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter[.]" 18 Pa.C.S. § 6106(a)(1).

The Commonwealth observes that Superior Court case law generally requires severance of charges where the proof of the disqualifying conviction is relevant only to the section 6105 charge and not relevant to the other offenses on trial. Commonwealth's Brief at 43-45 (citing *Commonwealth v. Jones*, 858 A.2d 1198, 1206-07 (Pa. Super. 2004)). Specifically, in *Commonwealth v. Jones*, the Superior Court stated that it is well-settled that a charge for section 6105 should be severed from other charges where the other charges do not require evidence of a prior offense. *Jones*, 858 A.2d at 1206-07. However, the Commonwealth explains, that rule does not apply here because the limited stipulation did not reveal that Holt had a prior conviction but only that he was disqualified from possession of a firearm. Commonwealth's Brief at 43-45. Further, Holt's possession of an unlawful firearm "was the motive the Commonwealth alleged for the murder of a law enforcement officer[,]" and therefore was relevant and admissible at his trial for first-degree murder. *Id.* at 44. Accordingly, the Commonwealth argues "the fact of [Holt's] prohibition, and not the details of the crime that rendered him a felon, was vital to establishing [Holt's] motive to flee from and ultimately kill a pursuing officer." *Id.* at 45.

A motion to sever charges is addressed to the discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. *Commonwealth v. Paolello*, 665 A.2d 439, 451 (Pa. 1995). The trial court may order separate trials pursuant to Pennsylvania Rule of Criminal Procedure 583 "if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583. The critical question in this analysis is whether the accused has been prejudiced by the decision not to sever, and the accused bears the burden of demonstrating prejudice.[20]

---

[20] Notably, Holt asserts that he is entitled to relief based on the test set forth in *Commonwealth v. Collins*, which requires trial courts to consider "[1] whether the evidence of each of the offenses would be admissible in a separate trial for the other; [2] whether such evidence is capable of separation by the jury so as to avoid danger of confusion, and if the answers to these inquiries are in the affirmative; [3] whether the

*Commonwealth v. Lopez*, 739 A.2d 485, 501 (Pa. 1999) (determining that trial court did not abuse its discretion in declining to order separate trials of co-defendants).

The trial court did not abuse its discretion in denying Holt's motion to sever. The stipulation regarding Holt's disqualification from possessing a firearm informed the jury that Holt was not permitted to possess a firearm, but it did not specify the reason for his disqualification. N.T., 11/8/2019, at 906-07. The jury did not hear evidence of Holt's prior convictions and, contrary to Holt's speculations, had no basis to assume that prior criminal conduct was the basis for Holt's disqualification. Significantly, according to the Commonwealth, Holt's inability to lawfully possess a firearm was his motive for fleeing from and killing Officer Shaw. The Commonwealth's theory was that the initial unlawful activity was the defendant's motive for his subsequent offense. Thus, evidence of Holt's disqualification from possession of firearms was relevant and admissible to prove the first-degree murder charge. Because the evidence of Holt's unlawful possession of a firearm was admissible at the murder trial, and because no evidence was admitted regarding Holt's prior offenses that led to his disqualification from possessing a firearm, we find that the trial court did not abuse its discretion when it determined that Holt would not be prejudiced by the offenses being tried together.

---

defendant will be unduly prejudiced by the consolidation of offenses." *Commonwealth v. Collins*, 703 A.2d 418, 422 (Pa. 1997) (referring to the former versions of Rules 582 and 583 found at Rules 1127 and 1128) (internal citations omitted).

However, Holt overlooks that *Collins*, which followed the approach set forth in *Commonwealth v. Lark*, 543 A.2d 491, 496-97 (Pa. 1988), applies "[w]here the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations[.]" *Collins* and *Lark* each involved temporally distinct criminal episodes. Presently, the charged offenses were based "on the same act or transaction," and were charged in a single criminal information. Therefore, the trial court's decision not to sever is subject only to the prejudice component.

## VII. Introduction of co-conspirator statements

Holt next argues that the trial court erred in admitting hearsay in the form of statements made by Lakita Cain through the testimony of Holly Clemons. The trial court agreed with the Commonwealth that the statements were admissible pursuant to the "co-conspirator exception" to the hearsay rule, which permits the introduction of a statement against the opposing party where the statement "was made by the party's coconspirator during and in furtherance of the conspiracy." Pa.R.E. 803(25)(E).

The specific statements at issue were related by Clemons, a resident of 1206 Victoria Avenue at the time of Officer Shaw's murder. She testified that on November 18, 2017, one day after the shooting, Holt's relative Lisa Harrington arrived to meet with Cain, left via vehicle, and then returned shortly thereafter. N.T., 11/6/2019, at 497-502. Clemons testified to the following exchange:

> Q. When [Harrington] leaves, do you have any conversations with [Cain] about why [Harrington] came to the house?
>
> A. I did ask her what was going own [sic]. [Cain] was like – she had, like, to get stuff out of the house. She –
>
> Q. Who had to get stuff out of the house?
>
> A. [Cain]. She told [Harrington] to get things out of the house.
>
> Q. Did she say what she needed to get things out of the house?
>
> A. [Cain] did say that there was, like, a gun in the basement. I never seen [Harrington] go to the basement or –
>
> Q. I understand.

A.      – [Cain] go to the basement.

Q.      What did [Cain] say about that gun?

A.      She said it was [Holt's] gun and she had to get it out of
        the house so she called [Harrington].

Q.      Was she explaining to you why [Harrington] had come
        to the house that afternoon?

A.      That's what she said she was there for.

*Id.* at 502-03.  On re-direct examination, Clemons further clarified that she asked Cain "if it was [Holt's] gun," to which Cain replied that it was.  *Id.* at 523.

Holt objected to the introduction of these statements during pre-trial motions and prior to Clemons's testimony.  The Commonwealth replied that Clemons's statements fell within the co-conspirator exception.  *Id.* at 449, 455, 461-62, 464, 473-74.  While Holt argued that this was an uncharged conspiracy, suggesting that the coconspirator exception did not apply in such an instance, *see id.* at 449, 456, 475, he also objected in the alternative that if Clemons's statements did fall within the exception, the prejudice established by her statements outweighed their probative value.  *Id.* at 466-67, 475.  The trial court overruled these objections after holding an in camera hearing with Detective Dupilka to establish that there was an ongoing conspiracy among the residents of 1206 Victoria Avenue to hinder Holt's apprehension by law enforcement.  *Id.* at 464-78.

"Application of the coconspirator exception to the hearsay rule is predicated on agency principles—when the elements of the exception are established, each conspirator is considered an agent of the other, and therefore, a statement by one represents an admission by all."  *Commonwealth v. Johnson*, 838 A.2d 663, 675 (Pa. 2003).  The exception contains three elements: "[(1)] the existence of a conspiracy between the

declarant and the defendant must be demonstrated by a preponderance of the evidence; [(2)] the statements must be shown to have been made during the course of the conspiracy; and [(3)] they must have been made in furtherance of the common design." *Id.* at 674.

Holt challenges both the existence of a conspiracy between him and the declarant (Cain) as well as the existence of a conspiracy between Holt, Cain, and Clemons. Holt also argues that the exception "has its limits, especially with an uncharged conspiracy with no defined objective." Holt's Brief at 36. Holt concedes that the Commonwealth established a conspiracy between Cain and Taylor, albeit one limited to assisting Holt's attempts to evade capture. "While the prosecution successfully argued that an uncharged conspiracy existed due to the failure of Cain and Taylor's failure to disclose the whereabouts of [Holt] following the Shaw murder, there was no evidence of record of any conspiracy to hide the murder weapon." *Id.* at 37. In effect, Holt argues that Cain, Clemons and all the other residents of 1206 Victoria Avenue, as well as Harrington, could have conspired to remove incriminating evidence on their own accord, and not necessarily at Holt's behest. As well, Holt states that presenting Cain's statements through Clemons violated his rights to confront the witness. *Id.* at 42.

The Commonwealth responds that the testimony was properly admitted because all residents of 1206 Victoria Avenue, including Clemons, were involved in the conspiracy. Commonwealth's Brief at 29-33. Further, the Commonwealth asserts that Holt's counsel

never objected to the testimony as violating Holt's right to confrontation, and therefore, he waived the confrontation argument. *Id.* at 31.[21]

As with the other evidentiary rulings addressed above, we will reverse only if Holt shows that the trial court abused its discretion in deeming this evidence admissible. *Gill*, 206 A.3d at 466-67. The trial court's opinion explained its basis for admitting the statements as follows.

> The evidence showed repeated contact between the Defendant and the other residents of 1206 Victoria Avenue, which include Lakita Cain, Taylor Mitchell, Holly Clemons, Michael Luffey, and Antoinette Strong. The evidence further showed that while the Defendant remained underground, those residents repeatedly rebuffed police attempts to learn of his whereabouts in order to effectuate his arrest and to secure the weapon. Over a period of four days, during each of which the police appeared at that address, the residents concealed knowledge of the Defendant's whereabouts, his status as a resident at that address, and the fact that he had been there shortly after the shooting in a frantic state of mind, with a bleeding hand. Only when Michael Luffey began to fear that he might lose his children if he continued in this concerted course of conduct with the other residents and went to the police, did the fabrication and concealment begin to unravel.
>
> Holly Clemons testified that from Lakita Cain, she learned that Lisa Harrington was present to get the Defendant's gun out of the house. Hiding the gun from the police was of the utmost importance to the Defendant, who had contact with the others in the house and who ultimately said he was "sorry for the things he put us through."

---

[21] We agree with the Commonwealth that Holt's counsel's failure to raise the confrontation clause argument before the trial court resulted in waiver of that aspect of his argument. This Court has long held that "[i]t is a fundamental principle of appellate review that we will not reverse a judgment or decree on a theory that was not presented to the trial court." *Commonwealth v. Bishop*, 217 A.3d 833, 842 (Pa. 2019) (quoting *Kimmel v. Somerset Cty. Comm'rs*, 333 A.2d 777, 779 (Pa. 1975)). At trial, Holt's counsel explicitly objected to this evidence on the grounds that the statement was inadmissible hearsay and, alternatively, that the evidence was overly prejudicial, pursuant to Pa.R.E. 403. N.T., 11/6/2019, at 448-49, 466-67, 475. Counsel never mentioned Holt's rights under the confrontation clause.

From all of this, the court felt that, by reasonable inference from all of the circumstances present, a conspiracy existed inclusive of the Defendant and involving the other members of the household and that the statements made were in furtherance of and during the conspiracy involving the Defendant and the various persons at 1206 Victoria Avenue, including Holly Clemens, Lisa Harrington and Lakita Cain, inter alia.

Trial Court Opinion, 8/21/2020, at 34-35 (citations omitted).

The trial court did not err. The first question is whether there was a conspiracy between the declarant, Holt, and Clemons as the challenged statements were relayed by Cain to Clemons in response to Clemons's question. The Commonwealth is not required to establish the existence of conspiracy through direct evidence, and the conspiracy "may be inferentially established by showing the relation, conduct or circumstances of the parties." *Commonwealth v. Mayhue*, 639 A.2d 421, 432 (Pa. 1994). The trial court determined by a preponderance of the evidence that, following Officer Shaw's murder, the police questioned all the residents of 1206 Victoria Avenue daily until Holt's arrest, and on each occasion the residents concealed knowledge of Holt's whereabouts, his status as a resident at that address, and that he had been there shortly after the shooting. It was reasonable for the trial court to infer that this ongoing conduct demonstrated an agreement between the residents of 1206 Victoria Avenue to impede the Commonwealth's investigation.

Addressing Holt's argument that a conspiracy must be limited in its scope, we conclude that, under the circumstances, there is no difference between a conspiracy to frustrate law enforcement's attempts to locate Holt and a conspiracy to conceal evidence on Holt's behalf. In both scenarios, the conspirators share the overriding goal of shielding

Holt from arrest. The preponderance of the evidence as accepted by the trial court established that the residents of 1206 Victoria Avenue engaged in conduct designed to assist Holt in avoiding prosecution. Nor do we need to rely on the inferential strength of these circumstances, as there was evidence that Holt was a part of this conspiracy. Clemons testified that Cain and Mitchell had communications with Holt in the days following Officer Shaw's death. The trial court also cited the testimony of Michael Luffey, who was present for a phone call between Holt, Cain, and Mitchell, which took place on Cain's speakerphone. Holt acknowledged Luffey's presence and told them he was "sorry for the things he put us through." N.T., 11/6/2019, at 421-22. We agree that this evidence, while not overwhelming evidence of a conspiracy, satisfies the applicable preponderance standard as it establishes that Holt was in contact with the residents.[22]

Finally, addressing whether the statements were in furtherance of the conspiracy, we note that statements of prior activity can fail this aspect of the exception. *Commonwealth v. Johnson*, 838 A.2d 663, 675 (Pa. 2003) ("In a number of circumstances, however, where … the inculpatory statements are narrative declarations of past activity made to a non-participant in the asserted conspiracy, courts have found the essential in-furtherance-of attribute absent."). Thus, there is some merit to the argument that the statements here, which involve the completed activity of removing a firearm, failed to satisfy the in-furtherance-of requirement.

However, we find that the statements promoted the broader conspiratorial goal of impeding the Commonwealth's investigation. The exception "contains no requirement

---

[22] The Commonwealth draws our attention to additional facts not cited by the trial court, namely that Luffey testified that Cain asked Luffey for $100 to help Holt. N.T., 11/6/2019, at 430.

that the conspiracy identified as the basis for admissibility be related to the crime charged." *Id.* at 676. Accordingly, "in order to satisfy the in-furtherance-of requirement of the coconspirator hearsay exception, it is sufficient for the government to establish an intent to promote the conspiratorial objective." *Id.* at 675. In *Johnson*, the appellant Raymond Johnson was convicted of murdering Louis Combs. The evidence established that Johnson and Combs were rival drug dealers. Nicole Ramsey testified that she sold drugs for Johnson and was present for conversations between Johnson and a man known as "Izod," whom she identified as Johnson's "right-hand man," regarding a plan to eliminate Combs. *Id.* at 679. On the day of Combs's murder, Johnson testified that Izod told her, "we did them n_____s. You didn't think we would, but we did. There is not going to be a problem." *Id.* at 670. We determined that the evidence was admissible under the co-conspirator exception to hearsay.

> Here, as Johnson essentially concedes, the Commonwealth's evidence demonstrated, by a clear preponderance, a larger conspiracy between Appellant and Izod to distribute illegal drugs. Significantly, this is a conspiracy as to which the evidence demonstrated that Ramsey was not a third party, but a participant. In the course of Izod's remarks to Ramsey, he advised her of an act that eliminated a rival seller, thus promoting the objectives of the drug conspiracy, and instructed her to maintain a low profile for the time being to avoid detection in light of the expected, increased law enforcement activity. *Accord* [*United States v.*] *Johnson,* 200 F.3d [529] at 533 [(7th Cir. 2000)] (noting that statements made in furtherance of a conspiracy can take a variety of forms, including comments made "to inform other members about the progress of the conspiracy, to control damage to or detection of the conspiracy, to hide the criminal objectives of the conspiracy, or to instill confidence and prevent the desertion of other members").

*Id.* at 677 (footnote omitted).

Likewise, we find that the Commonwealth established a conspiratorial objective broader in scope than the limited nature posited by Holt. *See* Holt's Brief at 37-28 ("While the prosecution successfully argued that an uncharged conspiracy existed due to the failure of Cain and Taylor's failure to disclose the whereabouts of [Holt] following the Shaw murder, there was no evidence of record of any conspiracy to hide the murder weapon."). Clemons and Cain were both participants in a conspiracy to impede the Commonwealth's investigation. Cain's statements informing Clemons that another person removed a gun from the residence served to apprise Cain of the ongoing conspiracy. Additionally, Clemons's testimony reflected that Cain's statements were not spur of the moment. Instead, they were in direct response to Clemons's questioning. Cain telling Clemons that Harrington came over because she "had to get the gun out of the house" kept Clemons abreast of the conspiracy and thus satisfies the co-conspirator exception's in-furtherance-of requirement. Accordingly, we find that the trial court did not abuse its discretion in admitting Clemons's testimony.

## VIII. Proposed voir dire questions

The purpose of voir dire is to facilitate the empaneling of a "competent, fair, impartial, and unprejudiced jury" and thus a trial court's discretion concerning the scope of voir dire must "be considered in light of the factual circumstances of a particular criminal episode." *Commonwealth v. Proctor*, 585 A.2d 454, 460 (Pa. 1991); *Commonwealth v. England*, 375 A.2d 1292, 1295 (Pa. 1977). Notably, "flight alone" is not sufficient to convict, but the "evidence is relevant and admissible to establish an inference of guilt." *Commonwealth v. Gorby*, 588 A.2d 902, 909 (Pa. 1999).

Holt's counsel proposed the following question for voir dire, which the trial court refused:

You may hear that the Defendant did not turn himself in and was only arrested after a four day police search or manhunt for his whereabouts. Would that fact alone cause you problems?

N.T., 10/28/2019, at 16-18.

Holt argues that he was denied his constitutional right to due process by the trial court's refusal to approve a suggested voir dire question, "wherein the jury panel would be asked if the flight alone by [Holt] would prevent them from being a fair and impartial juror." Holt's Brief at 42. Holt argues that his alleged flight following the murder of Officer Shaw was portrayed by the Commonwealth as evidence of his guilt "and proved to be a significant factor in the jury's one-hour verdict after [seven] days of trial testimony." *Id.* at 43. It is his contention that given the significance of Holt's flight in the minds of the jurors, it should have been addressed during voir dire. *Id.* at 43-44.

The Commonwealth argues that Holt's question was "not relevant in seeking to determine whether jurors would be competent, fair, impartial, and unprejudiced … [but] [r]ather, the question at issue sought to gauge the efficacy of potential evidence." Commonwealth's Brief at 47. The Commonwealth asserts that the trial court's instruction that the jury "may not find the defendant guilty solely on the basis of flight or concealment" by itself was enough to address the concern raised by Holt. *Id.*

The scope of voir dire rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. *Commonwealth v. Bomar*, 826 A.2d 831, 849 (Pa. 2003). The record before us fails to demonstrate any abuse of that discretion. As both parties note, the singular purpose of voir dire is to provide the defendant with a "competent, fair, impartial, and unprejudiced jury." *England*, 375 A.2d at 1295. It "is not intended to provide a defendant with a better basis upon which to utilize his peremptory challenges[.]" *Id.*

Here, the proposed question appears to have been designed to inform Holt's counsel in advance what opinion a prospective juror might form when presented with evidence of Holt's flight. In speculating that his flight evidence was so significant to the jury's finding of guilt, Holt proves the Commonwealth's argument that he was not seeking to determine whether jurors would be fair, but rather, was seeking to gauge the efficacy of the evidence of flight. Holt's Brief at 43-44. A prospective juror's personal views are of no moment unless these opinions "are so deeply embedded as to render that person incapable of accepting and applying the law as given by the court." *England*, 375 A.2d at 1296.

The trial court instructed the jury regarding the significance and proper use of evidence of flight:

> [W]hen a crime has been committed and a person thinks they may be accused of committing it and he flees or conceals himself, such flight or concealment is a circumstance tending to prove that the person is conscious of guilt. Such flight or concealment does not necessarily show consciousness of guilt in every case. A person may flee or hide for some other motive and may do so even though innocent. Whether the evidence of flight or concealment in this case should be looked upon as tending to prove guilt depends on the facts and circumstances of this case and especially upon motives that may have prompted the flight or concealment.
>
> You may not find the Defendant guilty solely on the basis of flight or concealment.

N.T., 11/12/2019, at 1067. "So long as the juror is able to, intends to, and eventually does, adhere to the instructions on the law as propounded by the trial court, he or she is capable of performing the juror's function." *England*, 375 A.2d at 1296. We are bound to presume that the jury followed the trial court's instructions. *Commonwealth v. Robinson*, 864 A.2d 460, 513 (Pa. 2004); *Commonwealth v. Tedford*, 960 A.2d 1, 37 (Pa. 2008).

Accordingly, we find that the trial court did not abuse its discretion in denying Holt's proposed voir dire question.

## IX. Disclosing mitigation report prior to penalty phase

Holt challenges the propriety of an order that required him to turn over a report created by his mitigation specialist prior to the penalty phase of the proceedings. *See* Holt's Brief at 46. By way of background, in August 2019, the trial court entered an order requiring Holt to turn over his mitigation specialist's report to the Commonwealth by the tenth of September. On September 10, Holt's counsel represented to the Commonwealth that he did not have the report but that it was forthcoming. *See* N.T., 10/4/2019, at 3. Shortly thereafter, Holt filed a motion seeking to have the mitigation report placed under seal until the penalty phase of the proceedings. In response, the Commonwealth filed a motion to compel the production of the mitigation report. Following a hearing, the trial court granted the motion to compel and ordered Holt to provide the mitigation report to the Commonwealth. *Id.* at 13.

In his post-trial motions, Holt challenged this ruling as improper. The trial court addressed this allegation with citation to Rule 573(C) of Criminal Procedure, which governs disclosure by defendants. This rule provides for, of relevance here, the discovery of reports prepared by witnesses that the defendant intends to call as a witness when the report relates to that witness's potential testimony. *See* Trial Court Opinion, 8/21/2020, at 38 (discussing Pa.R.Crim.P. 573(C)(1)(a)). The trial court explained that Holt did not call his mitigation specialist as a witness at any point in the proceedings, nor was the report used in connection with the questioning of any witness. As Holt failed to establish

that the report was used or relied upon in any way, the trial court concluded that Holt's objection to this evidentiary ruling was without merit and moot. *Id.* at 39.

Before this Court, Holt does not challenge the discoverability of mitigation specialists' reports in general. Rather, the heart of his argument is that it was error for the trial court to require him to provide the Commonwealth with the report prior to the commencement of the penalty phase of the trial. *See* N.T., 10/4/2019, at 4-5; Holt's Brief at 46-48. To that end, he assails the trial court's citation to Rule 573, arguing that its reach does not encompass the mitigation report, as the mitigation specialist is not an expert witness nor an eyewitness. Holt's Brief at 47.

The resolution of issues regarding pre-trial discovery in criminal cases is entrusted to the trial court's discretion and will be upheld absent an abuse of that discretion. *Commonwealth v. Rucci*, 670 A.2d 1129, 1140 (Pa. 1996). Discretion is abused when the trial court misapplies the law, or where its judgment is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. *Commonwealth v. DiStefano*, 265 A.3d 290, 296 (Pa. 2021). Rule 573 governs pre-trial discovery and inspection. Subsection (C) provides as follows:

> (C) Disclosure by the Defendant.
>
> (1) In all court cases, if the Commonwealth files a motion for pretrial discovery, upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable, the court may order the defendant, subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to inspect and copy or photograph any of the following requested items:
>
> > (a) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the

defendant, that the defendant intends to introduce as evidence in chief, or were prepared by a witness whom the defendant intends to call at the trial, when results or reports relate to the testimony of that witness, provided the defendant has requested and received discovery under paragraph (B)(1)(e); and

(b) the names and addresses of eyewitnesses whom the defendant intends to call in its case-in-chief, provided that the defendant has previously requested and received discovery under paragraph (B)(2)(a)(i).

(2) If an expert whom the defendant intends to call in any proceeding has not prepared a report of examination or tests, the court, upon motion, may order that the expert prepare and the defendant disclose a report stating the subject matter on which the expert is expected to testify; the substance of the facts to which the expert is expected to testify; and a summary of the expert's opinions and the grounds for each opinion.

Pa.R.Crim.P. 573(C). As explained above, the trial court found that the mitigation report was discoverable under subsection (C)(1)(a) as the report of a witness Holt intended to call on his behalf. Although the trial court referenced this rule in its opinion, it ultimately disposed of Holt's challenge upon a finding that because the mitigation report was never utilized, the issue was not only meritless but moot. Holt does not respond to this conclusion, yet our review of the record supports the trial court's conclusion in this regard, as it reveals that Holt did not call his mitigation specialist as a witness and neither party used the mitigation report in any manner during any phase of trial. Importantly, Holt does not contend that the ruling forced him to alter his defensive strategy. Indeed, Holt admits that he cannot establish that he was harmed in any way because this ruling. Holt's Brief at 46. Aside from posing a hypothetical harm that could ensue, Holt does not establish fault with the trial court's ruling. Accordingly, we agree with the trial court's determination that this issue has been rendered moot. *See Printed Image of York, Inc. v. Mifflin Press,*

*Ltd.*, 133 A.3d 55, 59 (Pa. Super. 2016) ("An issue before a court is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy."). As such, any decision rendered on this issue would be merely advisory, and therefore, inappropriate. *Stuckley v. Zoning Hearing Bd. of Newtown Twp.*, 79 A.3d 510, 516 (Pa. 2013).

## X. Verdict of death

This Court is required to review every death sentence and "shall affirm the sentence of death unless it determines that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d)." 42 Pa.C.S. § 9711(h)(1), (3); *Commonwealth v. Harris*, 817 A.2d 1033, 1058 (Pa. 2002). The death penalty was imposed for the murder of Officer Shaw and the Commonwealth presented one aggravating circumstance, that Officer Shaw was a peace officer murdered while in the line of duty. 42 Pa.C.S. § 9711(d)(1). Holt conceded that the Commonwealth established the aggravating circumstance. N.T., 11/14/2019, at 94 ("[W]e concede that the government has established their aggravator."). The evidence supports this concession, and the "sound factual predicate for the aggravating factors bolsters a conclusion that the sentence was not the result of passion, prejudice or any other arbitrary factor." *Commonwealth v. Johnson*, 160 A.3d 127, 153 (Pa. 2017).

Holt submitted the catch-all mitigating circumstance. 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense."). One or more of the jurors found its presence, specifically the "lack of parental guidance growing up, [being] raised in a high crime

environment and [the] violent death of his brother." Sentencing Verdict Slip, 11/14/2019, at 3. Ultimately, the jury determined that the mitigating circumstances was outweighed by the aggravator.

Holt argues this was a highly publicized and emotionally charged case involving a victim that "was a young popular local white police officer[,]" while Holt "was a young African American male with a Muslim sounding name … from Allegheny County." Holt's Brief at 48. Holt notes that Westmoreland County has a limited number of African Americans in its jury pools.[23] Id. As a result, the jury was composed of all white jurors and alternates. Id. Holt also highlights the "passionate display of police presence" at "every minute of every trial proceeding … in full view of the jury." Id. It is his contention that this "unquestionably had a significant impact on the jury." Id. Holt contends that these factors resulted in an expedited guilty verdict and subsequent death sentence.[24] Id. at 48-49.

The Commonwealth asserts that Holt makes only "general claims" that his death sentence was the product of passion, prejudice, or other arbitrary factors. Commonwealth's Brief at 53. With respect to Holt's argument that he did not receive a proper verdict and sentence because of his race and the race of the jurors, the Commonwealth contends that this "is a spurious allegation unsupported by evidence." Id. at 53-54. Moreover, the record reflects that Holt "fully participated in jury selection[,]" making no claim of partiality or prejudice by any juror. Id. at 54. As for Holt's claim

---

[23] "According to U.S. Census Bureau records, 2.6% of Westmoreland County is African American." Holt's Brief at 48 n.22.

[24] The jury entered the guilty verdict one hour after it began deliberations, and a verdict of death two days later after less than two hours of deliberation. Holt's Brief at 14.

concerning the overwhelming police presence during the trial, the Commonwealth argues that this is not a matter of record and was not objected to, and is thereby waived. *Id.* (citing Pa.R.E. 103; Pa.R.A.P. 302). It also notes that the trial court previously explained that any police officers in attendance were not in uniform, and that any uniformed officers present "during trial were deputy sheriffs assigned for courtroom security." *Id.*; Trial Court Opinion, 8/21/2020, at 23. Lastly, the Commonwealth argues that the length of jury deliberations, by itself, does not support a finding of passion or prejudice, but rather "reflects the strength of the Commonwealth's case." Commonwealth's Brief at 55.

The Commonwealth correctly notes that Holt participated fully in jury selection without asserting partiality or prejudice on the part of any juror. Commonwealth's Brief at 53-54; Trial Court Opinion, 8/21/2020, at 23. We add that Holt did not challenge the composition of the panel. At its core, Holt's primary contention is that the jury deliberated too quickly, and thus it defies logic to conclude that the decision was not a result of passion, prejudice or arbitrary factors. *See* Holt's Brief at 14-15, 23, 43, 49. However, this Court has found that the length of jury deliberations by itself is not enough to demonstrate passion or prejudice. *Commonwealth v. Reyes*, 963 A.2d 436, 442 (Pa. 2009). Our review of the record reveals that this decision was solemnly rendered and in accordance with the jury's duty to follow the law. We do not find that the sentence was the product of passion, prejudice, or any other arbitrary factor.

Accordingly, we affirm all convictions and the sentence of death. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor. 42 Pa.C.S. § 9711(i).

Chief Justice Baer and Justice Todd join the opinion.

Justice Dougherty files a concurring opinion in which Justices Mundy and Brobson join.

Justice Wecht did not participate in the consideration or decision of this matter.